SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Lurdes Rosario** (A-91-15) (077420)

**Argued February 28, 2017 -- Decided June 6, 2017**

**LaVecchia, J., writing for the Court.**

In this appeal, the Court addresses whether and at what point defendant's interaction with the police officer escalated from a field inquiry into an investigative detention. The Court then assesses whether reasonable articulable suspicion supported the detention's restriction on defendant's freedom of movement.

The Colts Neck Police Department received an anonymous tip, on April 27, 2013, that defendant Lurdes Rosario was selling heroin from her home, located in a residential development known as "the Grande," as well as out of her "older burg[undy] Chevy Lumina." On May 1, 2013, at about 11:30 p.m., Officer Campan was patrolling in the Grande, and his attention was drawn to a moving silhouette in a parked burgundy Chevy Lumina.

Campan testified that he pulled up and parked his patrol car seven to ten feet behind defendant's vehicle and at a perpendicular angle. The cruiser's positioning blocked in defendant's car. Campan turned on the patrol car's rooftop, right alley light aimed at the parked vehicle, but not the siren or emergency lights. The alley light revealed a woman sitting in the driver's seat of the Lumina. Campan testified that the woman, later identified as defendant, looked back at him and then leaned toward the passenger's seat and was "scuffling around" with something there. He exited his car and approached her vehicle, going directly to the driver's-side door. Finding the driver's window half-open, he addressed defendant by asking for "identification and driver's license." After she produced them, he recognized her as the subject of the anonymous tip. Campan testified that he also recalled, at that moment, that he had arrested defendant on drug-related charges approximately six months earlier.

Campan asked defendant what she was doing, and she replied that she was smoking a cigarette. Campan testified that he did not observe a cigarette or cigarette butt. Campan asked her why she began to scuffle around the passenger-seat area when he pulled his car up behind hers. Defendant replied that she had been applying makeup and was putting it away in her purse. When Campan asked how she could apply makeup in the dark, she did not reply. Campan then asked defendant whether there was "anything he should know about" in the vehicle. According to Campan, defendant responded by stating something along the lines of "yes . . . it's the same thing you arrested me for before in the past." Then, according to Campan, defendant, unprompted, reached over to the passenger seat and produced an eyeglass case. Defendant opened the eyeglass case and Capman observed a white powdery substance that he identified as drugs. Campan ordered defendant out of the vehicle and placed her under arrest.

Defendant was charged with third-degree possession of a controlled dangerous substance. The motion court denied defendant's motion to suppress, concluding that the encounter did not escalate into an investigatory stop until Campan asked defendant whether she had anything in the car he should know about. By that point, the court found, the brief detention was supported by the officer's reasonable and articulable suspicion due to defendant's implausible responses to the officer's questions and his prior knowledge of her criminal activity. The court also rejected defendant's Miranda argument, determining that defendant voluntarily relinquished the drugs, volunteered statements to the officer, and was not in custody prior to her arrest. Defendant pled guilty. The Appellate Division affirmed, and the Court granted defendant's petition for certification, 227 N.J. 22 (2016).

**HELD**: Defendant was faced with an investigative detention once the officer blocked in her vehicle, directed the patrol car's alley light to shine into her car, and then approached her driver's-side window to address her. Under the totality of the circumstances, a reasonable person would feel the constraints on her freedom of movement from having become the focus of law enforcement attention. Accordingly, an investigative detention had begun. Reasonable articulable suspicion did not ripen prior to the officer's subsequent exchanges with defendant.

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Warrantless searches and seizures presumptively violate those protections, but not all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement. (p. 9)

2. Three categories of encounters with police have been identified by the courts: (1) field inquiry; (2) investigative detention; and (3) arrest. The test of a field inquiry is whether a defendant, under all of the attendant circumstances, reasonably believed he could walk away without answering any of the officer's questions. In contrast to a field inquiry, an investigative detention, also called a Terry stop or an investigatory stop, occurs during a police encounter when an objectively reasonable person would feel that his or her right to move has been restricted. Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's reasonable and particularized suspicion that an individual has just engaged in, or was about to engage in, criminal activity. An arrest requires probable cause and generally is supported through an arrest warrant or by demonstration of grounds that would have justified one. (pp. 9-11)

3. The key issue in this case lies in the distinction between a field inquiry and an investigative detention. The difference between a field inquiry and an investigative detention always comes down to whether an objectively reasonable person would have felt free to leave or terminate the encounter with police. The encounter is measured from a defendant's perspective. (p. 11)

4. A person sitting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car that shines a flood light into the vehicle, only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave. Here, the officer immediately asked for defendant's identification. Although not determinative, that fact only reinforces that this was an investigative detention. It defies typical human experience to believe that one who is ordered to produce identification in such circumstances would feel free to leave. That conduct is not a garden-variety, non-intrusive, conversational interaction between an officer and an individual. (pp. 11-16)

5. Because it was an investigative detention from the point that Campan took those directed actions toward defendant, the Court must consider whether, based on a totality of the circumstances, the encounter was "justified at its inception" by a reasonable and articulable suspicion of criminal activity. An anonymous tip, standing alone, inherently lacks the reliability necessary to support reasonable suspicion. Mere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity. The suspicious behavior identified by the State in defendant's later responses to Campan's questioning occurred after the investigative detention had begun. Neither those responses, nor her blurted-out incriminatory statements, nor the surrendered contraband can be used, post hoc, to establish the reasonable and articulable suspicion required at the outset of the investigative detention that here began earlier in time. (pp. 16-18)

6. Reasonable articulable suspicion was not present when this investigative detention began. Therefore, the statements and evidence obtained thereafter must be suppressed, and it is unnecessary to address the Miranda arguments advanced by the parties. (p. 18)

The judgment of the Appellate Division is **REVERSED**.

**JUSTICE SOLOMON, DISSENTING,** agrees with the majority that the encounter did not implicate Miranda, but views New Jersey jurisprudence to mandate a different holding as to when the encounter became an investigative detention and concludes that the interaction evolved from a field inquiry into an investigative detention when Campan asked whether there was anything in the vehicle he should know about. In Justice Solomon's view, the detention was lawful and the trial court properly denied defendant's motion to suppress. The majority's holding unreasonably and unnecessarily limits an officer's ability to explore a suspicious scenario and ensure that the community and officers are safe, and no crime is being committed, according to Justice Solomon.

**CHIEF JUSTICE RABNER and JUSTICES ALBIN and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE SOLOMON filed a separate, dissenting opinion, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.**

2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

        v.

LURDES ROSARIO,

    Defendant-Appellant.


        Argued February 28, 2017 – Decided June 6, 2017

        On certification to the Superior Court, Appellate Division.

        Laura B. Lasota, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Al Glimis, Assistant Deputy Public Defender, on the brief).

        Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Paul H. Heinzel, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel; Mark W. Morris, Legal Assistant, on the brief).

        Alexander R. Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Edward L. Barocas, Legal Director, attorney; Mr. Shalom, Mr. Barocas, Ronald K. Chen, Jeanne LoCicero, and Andrew Gimigliano, attorney of counsel, on the brief).


        JUSTICE LaVECCHIA delivered the opinion of the Court.

1

Defendant Lurdes Rosario pled guilty to third-degree possession of a controlled dangerous substance. She appealed, claiming error in the trial court's denial of her motion to suppress contraband found in her possession and statements that she made during her encounter with a Colts Neck police officer. After defendant's unsuccessful appeal to the Appellate Division, we agreed to review her suppression issues.

First and foremost, we must address whether and at what point defendant's interaction with the police officer escalated from a field inquiry into an investigative detention. Then we must assess whether reasonable and articulable suspicion supported the detention's restriction on defendant's freedom of movement.

The encounter took place on a May evening when defendant was in her car, which was parked lawfully, head-on in a lined parking space directly outside her apartment. The car's engine was off. The officer positioned his patrol car perpendicularly behind defendant's to box in defendant's car and engaged his vehicle's rooftop, right-side "alley" light to shine at her car. The officer then exited his patrol car and approached the driver's-side door of defendant's car to address her. We conclude that no objectively reasonable person in those circumstances would have felt free to leave. Under the totality of the circumstances, a reasonable person would feel the

2

constraints on her freedom of movement from having become the focus of law enforcement attention. Accordingly, we hold that an investigative detention had begun.

Because we also conclude that reasonable and articulable suspicion did not ripen prior to the officer's subsequent exchanges with defendant, we reverse the judgment under review.

I.

The facts as presented are derived from the testimony at the suppression hearing. Officer Gabriel Campan of the Colts Neck Police Department was the only witness to testify.

The officer explained that, before he encountered defendant in her car, the police had received an anonymous tip, on April 27, 2013, that defendant was selling heroin from her home at 6 Parker Pass, located in a residential development known as "the Grande," as well as out of her "older burg[undy] Chevy Lumina." The caller stated that defendant was making trips in the Lumina to drop off and pick up heroin from an address in Jackson Township. The officer testified that he became aware of the tipster's information through a "patrol notice" shared with officers at the beginning of each shift on April 27th.

A few days later, on May 1, 2013, at about 11:30 p.m., Campan was patrolling in the Grande. Campan testified that he turned onto Parker Pass and his attention was drawn to a moving silhouette in a parked burgundy Chevy Lumina. Campan later

3

testified that although he did not make an immediate connection between the parked car and the anonymous tip that had been called into the police, he did make that connection when he realized that the Lumina was parked in front of 6 Parker Pass.

Campan testified that he pulled up and parked his patrol car seven to ten feet behind defendant's vehicle and at a perpendicular angle. The Lumina was parked, front-end forward, in a space facing a curved curb. As a result, the cruiser's positioning blocked in defendant's car. According to Campan, because it was dark and neither the lights nor the engine of the Lumina were activated, he turned on the patrol car's rooftop, right alley light aimed at the parked vehicle. He did not turn on the siren or emergency lights. The alley light revealed a woman sitting in the driver's seat of the Lumina. Campan testified that the woman, later identified as defendant, looked back at him and then leaned toward the passenger's seat and was "scuffling around" with something there.

Campan testified that defendant's movement in the dark vehicle made him suspicious. He exited his car and approached her vehicle, going directly to the driver's-side door. Finding the driver's window half-open, he addressed defendant by asking for "identification and driver's license." After she produced them, he recognized her as the subject of the anonymous tip. Campan testified that he also recalled, at that moment, that he

4

had arrested defendant on drug-related charges approximately six months earlier.

Thereafter, the following exchanges took place.

Campan asked defendant what she was doing, and she replied that she was smoking a cigarette. Campan testified that he did not observe a cigarette or cigarette butt.

Campan asked her why she began to scuffle around the passenger-seat area when he pulled his car up behind hers. Defendant replied that she had been applying makeup and was putting it away in her purse. When Campan asked how she could apply makeup in the dark, she did not reply. He testified that he did not think her story made sense.

Campan then asked defendant whether there was "anything he should know about" in the vehicle. Campan testified that the question was intended to refer to anything illegal that might be in the car.

According to Campan, defendant responded by stating something along the lines of "yes . . . it's the same thing you arrested me [for] before in the past." Then, according to Campan, defendant, unprompted, reached over to the passenger seat and pulled out a mitten from which she produced an eyeglass case. Defendant opened the eyeglass case and Campan observed a white powdery substance that he identified as drugs -- either

5

cocaine or heroin -- and drug paraphernalia. Campan ordered defendant out of the vehicle and placed her under arrest.

Defendant was charged with third-degree possession of a controlled dangerous substance, in violation of N.J.S.A. 2C:35-10(a)(1). At the April 3, 2014, suppression hearing, defense counsel argued that Campan's encounter with defendant was from the outset an investigatory stop unsupported by reasonable and articulable suspicion. The defense also argued that defendant was in custody and entitled to Miranda[1] warnings when Campan began to question her and that her statements were involuntary. The State argued that the entire encounter was a field inquiry, or alternatively, that if the encounter had escalated to an investigative detention when Campan asked whether defendant had anything he should know about, the officer had reasonable and articulable suspicion of criminal activity. The State also maintained that no custodial interrogation took place implicating the requirement of Miranda warnings and that defendant's statements were voluntary.

The motion court denied defendant's motion to suppress, concluding that the encounter did not escalate into an investigatory stop until Campan asked defendant whether she had anything in the car he should know about, insinuating that

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

defendant might have contraband in her possession.  By that point, the court found, the brief detention was supported by the officer's reasonable and articulable suspicion due to defendant's implausible responses to the officer's questions and his prior knowledge of her criminal activity.  Notably, the court did not rely on the uncorroborated anonymous tip to support its finding of reasonable and articulable suspicion. The court also rejected defendant's Miranda argument, determining that defendant voluntarily relinquished the drugs, volunteered statements to the officer, and was not in custody for Miranda purposes prior to her arrest.

Defendant pled guilty to the third-degree possession charge and was sentenced to two years of probation.  The Appellate Division affirmed in an unpublished opinion.  The panel agreed with the trial court's outcome because it found sufficient evidentiary support for the determination that defendant's detention was based on reasonable suspicion.  More particularly, the panel determined that an investigative detention began when Campan asked defendant whether there was anything in the vehicle he should be aware of.  Prior to that point, the panel concluded, she was free to leave.  The panel held that by the time the officer posed the question that altered the encounter, turning it from a field inquiry into an investigative detention, he had reasonable and articulable suspicion to support his

7

action based on defendant's strange answers about smoking and putting on makeup, the time of day, the officer's recognition of defendant as someone he had previously arrested for drugs, and her scurrying around by the passenger seat. According to the panel, that totality provided the officer with a particularized and objective basis for suspecting criminal behavior. The panel also rejected defendant's <u>Miranda</u> arguments.

We granted defendant's petition for certification. 227 <u>N.J.</u> 22 (2016). We also granted the motion of the American Civil Liberties Union of New Jersey (ACLU-NJ) for leave to participate as amicus curiae.

In their arguments before us, the parties embellish on their positions advanced before the trial and appellate courts.

Arguing for reversal along with defendant, the ACLU-NJ maintains that an investigative detention had begun when Campan blocked defendant's vehicle, used his alley light to illuminate her car, and then approached her vehicle, because defendant would not reasonably have felt free to leave. At the very latest, amicus contends that when Campan made his request for identification, defendant was clearly subjected to an investigative detention. Alternatively, the ACLU-NJ argues that the encounter turned into a search when Campan asked defendant if there was contraband in the car, rendering this Court's consent-search jurisprudence controlling.

8

II.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution both provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Warrantless searches and seizures presumptively violate those protections, State v. Elders, 192 N.J. 224, 246 (2007), but "[n]ot all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement," State v. Rodriguez, 172 N.J. 117, 125 (2002).

In escalating order of intrusiveness upon a citizen's rights, three categories of encounters with police have been identified by the courts: (1) field inquiry; (2) investigative detention; and (3) arrest. We address each in turn.

A field inquiry is essentially a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer. See State v. Maryland, 167 N.J. 471, 483 (2001) (citing Florida v. Royer, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229, 236 (1983)). The individual does not even have to listen to the officer's questions and may simply proceed on her own way. See Royer, supra, 460 U.S. at 497-98, 103 S. Ct. at

9

1324, 75 L. Ed. 2d at 236. The test of a field inquiry is "whether [a] defendant, under all of the attendant circumstances, reasonably believed he could walk away without answering any of [the officer's] questions." Maryland, supra, 167 N.J. at 483. Because a field inquiry is voluntary and does not effect a seizure in constitutional terms, no particular suspicion of criminal activity is necessary on the part of an officer conducting such an inquiry. Elders, supra, 192 N.J. at 246.

In contrast to a field inquiry, an investigative detention, also called a Terry[2] stop or an investigatory stop, occurs during a police encounter when "an objectively reasonable person" would feel "that his or her right to move has been restricted." Rodriguez, supra, 172 N.J. at 126; see United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497, 509 (1980) (plurality opinion) (concluding that person is seized for Fourth Amendment purposes when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's "reasonable and particularized suspicion . . . that an individual has just

---

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

10

engaged in, or was about to engage in, criminal activity."
State v. Stovall, 170 N.J. 346, 356 (2002).

An arrest -- the most significant type of seizure by police
-- requires probable cause and generally is supported by an
arrest warrant or by demonstration of grounds that would have
justified one. See State v. Brown, 205 N.J. 133, 144 (2011);
see also State v. Dickey, 152 N.J. 468, 478-79 (1998)
(distinguishing between investigative detention and arrest).

The key issue in this case lies in the distinction between
a field inquiry and an investigative detention.

### III.

#### A.

The difference between a field inquiry and an investigative
detention always comes down to whether an objectively reasonable
person would have felt free to leave or to terminate the
encounter with police. The encounter is measured from a
defendant's perspective. Maryland, supra, 167 N.J. at 483. The
trial court and the appellate panel both believed an objectively
reasonable person in defendant's position would have felt free
to leave, at least up until the point when defendant was asked
directly whether she had anything in her vehicle that Campan
should know about. The Appellate Division accepted the State's
argument that because defendant was right outside her residence,
she could have left her vehicle, walked away from Campan, and

11

entered her home.  Under the totality of the circumstances, we are compelled to disagree.

A person sitting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car that shines a flood light into the vehicle, only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave.  That conclusion is consistent with ordinary notions of how a reasonable person responds to a demonstration of police authority.  See Rodriguez, supra, 172 N.J. at 129 ("[A]s a practical matter, citizens almost never feel free to end an encounter initiated by the police.").  Rather, such police activity reasonably would, and should, prompt a person to think that she must stay put and submit to whatever interaction with the police officer was about to come.

Here, the officer immediately asked for defendant's identification.  Although not determinative, that fact only reinforces that this was an investigative detention.  It defies typical human experience to believe that one who is ordered to produce identification in such circumstances would feel free to leave.  See, e.g., State v. Egan, 325 N.J. Super. 402, 410-11 (App. Div. 1999) (holding that officer's immediate demand for "driving credentials" upon approaching defendant's parked van elevated field inquiry into constitutional seizure).

12

Moreover, this matter is not analogous to the few cases in this state addressing an officer's less dramatically begun, more casual and conversational interactions with a person in a parked car, which have generally been viewed as field inquiries involving a lesser degree of intrusiveness than a motor vehicle stop. See, e.g., State v. Adubato, 420 N.J. Super. 167, 180-81 (App. Div. 2011), certif. denied, 209 N.J. 430 (2012); State v. Stampone, 341 N.J. Super. 247, 252-53 (App. Div. 2001). Defendant rightfully distinguishes that precedent by emphasizing the totality of circumstances in this instance, particularly that Campan began the encounter by partially blocking in her car from the rear, activating the alley light in order to flood the area with light, and exiting and proceeding directly to defendant to address her. That conduct is not a garden-variety, non-intrusive, conversational interaction between an officer and an individual. See Rodriguez, supra, 172 N.J. at 126 (noting that encounter could be treated as field inquiry "if [an officer's] questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature" (quoting State v. Davis, 104 N.J. 490, 497 n.6 (1986))). The differentiating feature of a field inquiry is that, from the perspective of the person approached by an officer, the interaction is voluntary. See Maryland, supra, 167 N.J. at 483 (emphasizing that hallmark of

13

field inquiry is that person "need not answer any question put to him[,] . . . may decline to listen to the questions at all and may go on his way" (quoting Royer, supra, 460 U.S. at 497, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236)).

The show of law enforcement attention focused on defendant that occurred here should result in a person's staying put and engaging with the officer who has exhibited such a pointed intention to interact with that person. Our case law instructs members of the public to submit to a police officer's show of authority, not to look for an exit. Case law tells people to obey words and deeds of law enforcement that communicate demands for directed behavior and to raise constitutional objections thereafter. See State v. Crawley, 187 N.J. 440, 443-44 ("Defendant's obligation to comply with [an officer's] command did not depend on how a court at some later time might decide the overall constitutionality of the street encounter."), cert. denied, 549 U.S. 1078, 127 S. Ct. 740, 166 L. Ed. 2d 563 (2006); Rodriguez, supra, 172 N.J. at 128 (explaining that "tenor of the officer's actions" affects totality of circumstances analysis into whether investigative detention took place); Davis, supra, 104 N.J. at 498 (depending on factual circumstances, detaining individual by blocking path in public place can be sufficient for finding investigative detention).

14

The total effect of the interaction must be assessed -- and assessed from its likely effect on a reasonable person -- in order to determine whether an individual is being subjected to a field inquiry or an investigative detention. Unlike the dissent, we do not parse this encounter based on the reasonableness of Campan's actions viewed from his perspective. The overall impact of the encounter must be evaluated based on its effect on an individual in defendant's position and whether she reasonably would have felt free to extract herself from Campan's focused demonstration of authority toward her. See Rodriguez, supra, 172 N.J. at 129; accord Michigan v. Chesternut, 486 U.S. 567, 573-74, 108 S. Ct. 1975, 1979-80, 100 L. Ed. 2d 565, 572 (1988) (explaining that "reasonable person" test is designed to evaluate effect of officer conduct "taken as a whole, rather than to focus on particular details of that conduct in isolation").

In fact, this appeal presents two distinct "totality of the circumstances" inquiries. The first is whether a reasonable person faced with the circumstances in which defendant was approached by Campan would feel free to leave. If not, the encounter is an investigative detention. In the circumstances presented here, we conclude that defendant was faced with an investigative detention once Campan blocked in her vehicle, directed the patrol car's alley light to shine into her car, and

15

then approached her driver's side window to address her. Because we conclude that it was an investigative detention from the point that Campan took those directed actions toward defendant, we then must consider the second question of whether, based on a totality of the circumstances, the encounter was "justified at its inception" by a reasonable and articulable suspicion of criminal activity. Dickey, supra, 152 N.J. at 476 (quoting Terry, supra, 392 U.S. at 20, 88 S. Ct. at 1879, 20 L. Ed. 2d at 905).

B.

In considering whether the reasonable and articulable suspicion standard was met here, we note that the State has conceded that the anonymous tip accusing defendant of drug distribution is entitled to little weight in our analysis. We have long recognized that an anonymous tip, standing alone, inherently lacks the reliability necessary to support reasonable suspicion because the informant's "veracity . . . is by hypothesis largely unknown, and unknowable." Rodriguez, supra, 172 N.J. at 127-28 (quoting Alabama v. White, 496 U.S. 325, 329, 110 S. Ct. 2412, 2415, 110 L. Ed. 2d 301, 308 (1990) (internal quotation marks omitted)). The fact that the tip accurately identified defendant and her vehicle is of no moment because a tipster's knowledge of such innocent identifying details alone "does not show that the tipster has knowledge of concealed

16

criminal activity." Florida v. J.L., 529 U.S. 266, 272, 120 S. Ct. 1375, 1379, 146 L. Ed. 2d 254, 261 (2000).

Here, we have no corroborated criminal activity. We have only Campan observing defendant (identified later in the exchange) in her own car parked in front of her residence. His recognition that the location was connected to the anonymous tip does not support reasonable and articulable suspicion. The officer's observation, upon shining a light in defendant's vehicle, that defendant was "scuffling around" and leaning toward the passenger seat also does not provide a reasonable basis to suspect criminality. The Court has held that "there are some cases in which 'furtive' movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion that the person may be armed and dangerous or probable cause to believe that the person possesses criminal contraband." State v. Lund, 119 N.J. 35, 48 (1990); see also State v. Gamble, 218 N.J. 412, 431 (2014); cf. State v. Bacome, 154 N.J. 94, 107-08 (2017) (noting that during detention arising from legitimate traffic stop, furtive gestures may support heightened caution). However, an officer's safety concerns based on the asserted "furtive" movements by defendant cannot provide reasonable and articulable suspicion to support a detention in the first instance. Nervousness and excited movements are common responses to unanticipated encounters with

17

police officers on the road, and "[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity." Lund, supra, 119 N.J. at 47 (alteration in original) (quoting State v. Schlosser, 774 P.2d 1132, 1137 (Utah 1989)).

The suspicious behavior identified by the State in defendant's later responses to Campan's questioning occurred after the investigative detention had begun. Neither those responses, nor her blurted-out incriminatory statements, nor the surrendered contraband can be used, post hoc, to establish the reasonable and articulable suspicion required at the outset of the investigative detention that here began earlier in time. We conclude that reasonable and articulable suspicion was not present when this investigative detention began. Therefore, we hold that the statements and evidence obtained thereafter must be suppressed. See State v. Herrerra, 211 N.J. 308, 330 (2012) (explaining exclusionary rule barring introduction into evidence of "fruits" of illegal search or seizure).

As a result of our determination, it is unnecessary for us to address the Miranda arguments advanced by the parties.

                                IV.

The judgment of the Appellate Division is reversed.

18

CHIEF JUSTICE RABNER and JUSTICES ALBIN and TIMPONE join in JUSTICE LaVECCHIA's opinion.  JUSTICE SOLOMON filed a separate, dissenting opinion, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

        v.

LURDES ROSARIO,

    Defendant-Appellant.

    JUSTICE SOLOMON, dissenting.

    I agree with the majority that the encounter between defendant and Patrolman Gabriel Campan did not implicate Miranda.  However, I view our State's jurisprudence to mandate a different holding than that reached by the majority as to when the encounter became an investigative detention.  I conclude, as did the lower courts, that the interaction evolved from a field inquiry into an investigative detention when Campan asked whether there was anything in the vehicle he should know about.  Furthermore, at the moment he asked that question, Campan had a "reasonable and articulable suspicion to believe" that defendant "just engaged in, or was about to engage in, criminal activity," and so his detention was lawful and the trial court properly denied defendant's motion to suppress.  State v. Stovall, 170 N.J. 346, 356 (2002) (citing Terry v. Ohio, 392 U.S. 1, 21, 88

S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)).  For those reasons, I respectfully dissent.

I.

At the outset, I stress the importance of avoiding an unreasonable expansion of the investigative detention principle.  As the majority aptly recognizes, the critical distinction between a field inquiry and an investigative detention is whether an objectively reasonable person would have felt free to leave.  State v. Rodriguez, 172 N.J. 117, 128 (2002); State v. Maryland, 167 N.J. 471, 483 (2001).  The majority finds that a reasonable person would not have felt free to leave -- and thus an investigative detention began -- once Campan parked behind defendant's vehicle, shined the alley light into her car, and approached the driver's-side window.  Given the circumstances, however, I consider that moment to be a part of Campan's lawful field inquiry.

First, although Campan suspended defendant's ability to drive away when he parked his vehicle behind hers, I do not find this act indicated an intention to detain defendant, or that a reasonable person would have felt as though she were unable to leave.  This Court has held that when a police officer blocks an individual's path, an investigative detention is underway.  State v. Tucker, 136 N.J. 158, 166 (1994); State v. Davis, 104 N.J. 490, 498 (1986).  However, in Davis and Tucker, the

2

defendants were in transit when police stopped their motion and blocked any available escape route. Tucker, supra, 136 N.J. at 162; Davis, supra, 104 N.J. at 498. Therefore, officers showed an intention to capture the defendants, rather than simply to engage in a brief discussion. See Tucker, supra, 136 N.J. at 166; see also Terry, supra, 392 U.S. at 16, 88 S. Ct. at 1877, 20 L. Ed. 2d at 903 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

While Campan's vehicle was parked close enough to deny defendant the ability to drive away, she was parked in front of her own house when the officer stopped behind her. Her engine and headlights were off. Defendant was not in motion and did not manifest any intention to move her vehicle prior to and during the encounter. It is also evident that defendant was able to exit her vehicle without restriction and enter her home, or walk down the street.

Second, Campan's act of shining his alley light into defendant's car cannot rationally be considered an impediment to defendant's movement or conduct that would make a reasonable person feel unable to leave. When an officer comes upon an individual sitting in a car at night, with the motor and lights off, in an area that "has its days" of crime, it is reasonable for him or her to use a light to accurately assess the

3

surroundings.  That does not convert a field inquiry into an investigative detention.

Third, Campan's approach of defendant's vehicle was to investigate the scene, and nothing suggests the officer did so in a way to make defendant reasonably feel as though she were not allowed to exit her vehicle.  Including this conduct of Campan in the majority's finding of an investigative detention severely restricts an officer's ability to safely and appropriately explore a suspicious situation.

In Davis, supra, this Court made clear that a police officer does not violate the Fourth Amendment by "merely approaching an individual on the street . . . , by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen."  104 N.J. at 497 (quoting Royer, supra, 460 U.S. at 497, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236).  Campan's conduct, up to the point at which the majority finds an investigative detention began, fits squarely within this jurisprudence on permissible field inquiries.  Moreover, the United States Supreme Court provided the following examples as circumstances in which an investigative detention may be found:  "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the

4

officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497, 509 (1980). Here, there was no similar expression of dominance or authority at the point where Campan approached defendant's vehicle.

The majority also considers the fact that Campan asked defendant for identification as proof that she was detained. However, this request is typical of a field inquiry and cannot, on its own, elevate the officer's conduct to the degree we find necessary for an investigative detention. See State v. Sirianni, 347 N.J. Super. 382, 391 (App. Div.) ("[A] request for identification does not, in and of itself, transform a field inquiry into a Terry stop."), certif. denied, 172 N.J. 178 (2002). Because it is independently insufficient to transform the situation into an investigative detention, and the other factors that existed at that point are unpersuasive, I find no merit in viewing this inquiry as reinforcement for the majority's finding.

The majority attempts to distinguish this case from State v. Adubato, 420 N.J. Super. 167 (App. Div. 2011), certif. denied, 209 N.J. 430 (2012), and State v. Stampone, 341 N.J. Super. 247 (App. Div. 2001), on the ground that Campan's conduct was not "a garden-variety, non-intrusive, conversational interaction between an officer and an individual." Ante at ___

5

(slip op. at 13). I fail to see how an officer's mere approach of an already parked vehicle is intrusive, nor do I find any basis for concluding Campan's conduct up to that point was anything more than casual considering no dialogue had yet taken place. See State v. Nishina, 175 N.J. 502, 510 (2003) ("A permissible inquiry occurs when an officer questions a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature."). Moreover, both Adubato and Stampone confirm that an investigative detention did not begin at any point before Campan and defendant engaged in conversation.

In Adubato, supra, the officers activated their emergency flashers, pulled behind the parked vehicle -- which was also parked in front of the defendant's home -- and immediately approached the driver's-side window; that conduct is identical to the officer's conduct in this case. 420 N.J. Super. at 174. The Adubato panel first reasoned that the officer was justified in making further inquiry because he "observed the car stopped on the side of the road, with the engine running, the lights on, and the driver speaking loudly on a cell phone," and "did not know whether he was dealing with an intoxicated driver . . . [or] someone who was looking around the neighborhood for opportunities to engage in criminal conduct." Id. at 179-80. Further, the Adubato panel found that an officer's use of flashers when pulling behind a parked car did not elevate the

6

inquiry to an investigative detention, particularly where it is routine for officers to use their flashers when "rendering roadside assistance" and where it enhances the officers' safety. Id. at 180-81. Also instructive is the panel's ultimate finding that the situation did not escalate to an investigative detention until after the officer approached the driver's-side window and a conversation began in which the defendant admitted to having been drinking. Id. at 182.

Here, I find Campan equally justified in making a further inquiry because defendant was engaged in even more suspicious behavior than the defendant in Adubato. Defendant sat in her car in the middle of the night with both the engine and lights off and, when the car was illuminated, made furtive movements in the front seat. In addition, given the time of day and location, it was reasonable for safety reasons for Campan to illuminate the area. Accordingly, I agree with the Adubato panel's reasoning and cannot find justification in qualifying Campan's mere approach of the vehicle as determinative.

In Stampone, the panel was tasked with determining whether the trial court had appropriately convicted the defendant of committing a disorderly persons offense. Stampone, supra, 341 N.J. Super. at 253. While the appeal did not turn on "the law of search and seizure," the panel noted that the defendant was detained, at the very earliest, when the officer instructed him

7

not to leave.  Ibid.  Notably, that was well after the officer stopped his patrol vehicle and approached the defendant.  Id. at 249-50, 253.  Further, as here, the officer came upon a suspicious situation, parked his vehicle, and approached the driver's-side window of the car in question.  Ibid.  Those circumstances were not held to mark the beginning of a detention in Stampone and neither should they here.

I believe that the encounter escalated into an investigative detention when Officer Campan asked if there was anything in the vehicle that he should know about, referring to contraband.  At that point, defendant knew the officer was investigating possible criminal activity, and a reasonable person under the circumstances would not have felt "free to leave."  Stovall, supra, 170 N.J. at 355 (quoting Mendenhall, supra, 446 U.S. at 554, 100 S. Ct. at 1877, 64 L. Ed. 2d at 509).  This position is in line with our State's jurisprudence.  See, e.g., State in Interest of J.G., 320 N.J. Super. 21, 31 (App. Div. 1999) (finding when police officer asks individual whether he is carrying "anything on him that he shouldn't have," question converts field inquiry into detention).

II.

Not only do I find that an investigative detention occurred when Campan inquired about any potential contraband, but I also find that the investigative detention itself was lawful because,

8

at that moment, based upon all of the facts and circumstances, Campan had a "reasonable and particularized suspicion to believe that [defendant had] just engaged in, or was about to engage in, criminal activity." Stovall, supra, 170 N.J. at 356 (citing Terry, supra, 390 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). While no clear "mathematical formula" is needed to come to this logical conclusion, see Davis, supra, 104 N.J. at 505, I find the following compelling.

The encounter between defendant and Campan took place during the late hours of the night, when it was dark, in a location that the officer suggested "has its days" as a high-crime area. When Campan shined his alley light into the vehicle, he saw defendant look back at him and then scuffle around in the passenger seat. After the officer checked defendant's identification, he recognized her from a prior arrest and realized that she was the subject of the anonymous phone tip. Upon ordinary questioning about her furtive movements, defendant gave responses that were seemingly nonsensical. Defendant claimed to have been smoking, but there were no cigarettes. Defendant also told the officer that she was leaning towards the passenger side of the vehicle because she had just applied makeup and was putting it away, yet it was dark and no lights were on. I find that these responses by

9

defendant reasonably raised the officer's suspicion of criminal conduct.  State v. Carvajal, 202 N.J. 214, 228 (2010).

                              III.

     In sum, the critical difference between my view of the encounter between defendant and Campan and that of the majority is the point at which the encounter evolved into an investigative detention.  The majority's holding unreasonably and unnecessarily limits an officer's ability to explore a suspicious scenario and ensure that the community and officers are safe, and no crime is being committed.  As this Court stated in State v. Gray, "police officers are trained in the prevention and detection of crime.  Events which would go unnoticed by a layman ofttimes serve as an indication to the trained eye that something amiss might be taking place or is about to take place."  59 N.J. 563, 567-59 (1971).  Indeed, as we stated in that case, "[t]he police would be derelict in their duties if they did not investigate such events."  Id. at 58.  Having identified a different point in time to mark the beginning of the investigative detention, I also conclude that the detention itself was lawful.

     For those reasons, I would affirm the judgment of the Appellate Division.