**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3325-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAVARUS PATTERSON,

     Defendant-Appellant.

_____

Argued May 22, 2024 – Decided August 26, 2024

Before Judges Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 22-08-0988.

Laura B. Lasota, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Laura B. Lasota of counsel and on the brief).

Leandra L. Cilindrello, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Leandra L. Cilindrello, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress a handgun, a drum magazine, and controlled dangerous substances (CDS) found in a fanny pack—a cross-body bag—he was wearing during the course of a Terry[1] stop and subsequent frisk by police, defendant Javarus Patterson pleaded guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and was sentenced to a seven-year custodial term, subject to a forty-two month parole disqualifier under the Graves Act, N.J.S.A. 2C:43-6(c).[2] Defendant contends the Terry stop was unlawful because the State's evidence did not establish detectives had a reasonable suspicion he was engaged in criminal activity, and defendant claims the frisk was unlawful because the detectives lacked a reasonable suspicion he was armed. We reverse the court's ruling because the competent evidence presented by the State did not establish a reasonable articulable suspicion defendant was engaged in criminal activity

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

[2] Defendant also pleaded guilty to two counts of third-degree possession of CDS as charged under Passaic County Indictment Nos. 22-08-0937 and 22-09-1015. He does not appeal from his CDS convictions.

permitting the Terry stop preceding the frisk that resulted in the recovery of the handgun.

On August 26, 2022, a grand jury charged defendant under indictment No. 22-08-0988 with: second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count one); second-degree possession of a handgun while committing certain CDS offenses, N.J.S.A. 2C:39-4.1 (count two); fourth-degree possession of a large-capacity magazine, N.J.S.A. 2C:39-3(j) (count three); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (count four); fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2) (count five); third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1) (count six); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3) (count seven); third-degree possession of CDS with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-7 and -5(a) (count eight); and second-degree possession of CDS with intent to distribute within 500 feet of a public park, N.J.S.A. 2C:35-7.1 and -5(a) (count nine).

Following indictment, defendant moved to suppress evidence by challenging the legality of the stop, which preceded the frisk that resulted in the discovery of the handgun, drum magazine, and CDS evidence recovered from the fanny pack he was wearing across the front of his chest. At the

hearing, the State relied on the testimony of Detective Mustafa Dombayci from the Paterson Police Department's Community Stabilization Unit (CSU) and the body worn camera (BWC) footage of Dombayci and another CSU Detective Jonathan Traynor.

Detective Dombayci testified that he was driving an unmarked, black patrol car equipped with lights and sirens, while on patrol in the City of Paterson with Traynor and two other detectives from the CSU during daylight hours when he saw defendant and approximately nine other individuals standing near the intersection of Madison and Essex Streets in an area known for criminal activity, that Detective Dombayci characterized as a "hotspot." According to Detective Dombayci, "[a] hotspot is . . . an area that has been deemed a high-crime area; somewhere where there [has] been an uptick in shootings, whether fatal, non-fatal, or just a round of ammunition being fired. Open-air drug markets can determine a hotspot." Detective Dombayci testified the area was known to him, explaining he had "made numerous arrests in that area, for both CDS and firearms offenses . . . it is one of our hotspots," and "[t]here's been multiple fatal and non-fatal shootings. . . . Within a month prior to this incident, there was a shooting where four individuals were struck and one juvenile sustained life-ending injuries."

4

Detective Dombayci testified that, while driving the patrol vehicle, he "noticed one individual in particular wearing a fanny pack style bag across his chest." Detective Dombayci testified that he believed defendant had seen his undercover vehicle. He further testified that upon defendant noticing "police presence, [he] saw [defendant] do what's known as a security check; [which] is a subconscious movement to ensure that an item is still where it's supposed to be." When asked by the prosecutor what a security check looks like, Detective Dombayci stated "[s]o, if I were to be wearing a fanny pack on my chest, it would be a quick tap. If my firearm was on my waist, a quick tap to my waist. That would be a security check." On cross-examination, Detective Dombayci further explained that "[a]s [he] was turning onto Madison Street, [he] saw [defendant] conduct the security check" but he did not know if defendant made one tap or two taps. He also testified that defendant was "[f]acing towards the street, on the sidewalk" with his back to the building when he tapped the fanny pack. Detective Dombayci based on his training in the Bergen Police Academy and five-years of experience in law enforcement—first as a patrol officer and now as a detective in the "CSU"—and, having observed over one hundred security checks, believed defendant was "more than likely" in possession of a gun.

5

Detective Dombayci pulled the car over and he and the other detectives exited the car. The officers' BWCs did not began recording audio until they began exiting the patrol car. Detective Dombayci is heard on the BWC footage first saying "10-1,"[3] then telling defendant and the others with whom he was standing, "You guys kind of know the deal," and saying to defendant, "So. Javarus, do me a favor. Javarus, put your hands up."

Detective Dombayci testified that as he approached, defendant's hands went closer to the fanny pack but when he ordered defendant to put his hands up, defendant raised them. He also testified that as he approached, "[defendant's] hands kind of dropped. [A]nd then went back up. . . . [h]is elbows dipped. And then came back up." He further testified defendant had a cell phone in his right hand and at no time did defendant seek to reach inside the fanny pack.

Detective Dombayci then initiated a pat down of defendant. The BWC footage shows Dombayci touching defendant and the fanny pack itself and asking: "Is that a bottle?" Defendant then lowered his arms and Detective

---

[3] The detective later testified, and the court found, that his statement, "10-1," "alerted police headquarters that [the detectives] were getting out of the car to investigate."

Dombayci yelled "gun," before the detectives arrested defendant and seized the gun from the fanny pack.

On direct and cross examination, Detective Dombayci denied that he reached into the fanny pack or manipulated it in any way other than touching the front of it. He testified that in touching the fanny pack, he could feel the handle and barrel of a gun and that was why he asked defendant "[i]s that a bottle?" When asked by the prosecutor why he said that, Detective Dombayci replied, "[b]ecause about a year prior, [defendant] had us chase him for about four blocks. And in the summer heat, I'm not looking forward to running four blocks." Detective Dombayci also stated that he was attempting to prevent defendant from running away as defendant had done a year earlier when he had attempted to arrest him in a separate incident. There is no dispute that Detective Dombayci had arrested defendant approximately one year earlier and that defendant had been found in possession of a gun at that time. At the conclusion of Detective Dombayci's testimony, the court reserved decision on the motion.

The court issued its oral opinion denying the motion to suppress. The court found the testimony of Detective Dombayci credible, and stated:

> All right, this is my decision. This Court observed the demeanor of [Detective] Dombayci as he testified. He

7

answered the questions directly, was respectful to the attorneys questioning him, and acknowledged when he was not sure of the detail. For example, he said that the security check he observed the [d]efendant make was either one or two quick taps on the fanny pack, but he was sure that it had been a security check movement -- either one tap or two taps.

Having heard his testimony and having viewed the videos . . . which support his testimony as to the portion of the event that was captured on video as he encountered the [d]efendant, and further noting that it appeared on the videos to still be daylight at 6 p.m., which gave --which made for clear observation purposes, I conclude that he was a very credible witness.

. . .

I believe that [Detective] Dombayci then observed the [d]efendant conduct the so-called security check of his fanny pack, which contained a loaded semi-automatic handgun.

The Detective indicated he observed one or two quick taps. He testified that both his training at the Bergen County Police Academy, and his on-the-job observations of at least [one hundred] other people, had taught him that this is an unconscious tap of the area where a gun is located to make sure it is secure.

Based on the totality of the circumstances, the court found the officers had a reasonable and articulable suspicion defendant was armed with a handgun such that they had a proper basis for the Terry stop and the subsequent frisk. The court reasoned that:

8

as the Detective pulled in front of the group and approached the [d]efendant, a careful and objective review of the totality of circumstances, which again, with a high-crime area where guns and gun violence and CDS activity was frequent; his observation of the security check, when the [d]efendant undoubtedly saw the police car; and his knowledge of the [d]efendant, who had been possession –- in possession of a handgun one year before, when he was a juvenile, and who had then engaged in a [four]-block chase away from the Detective who had recovered a handgun from him; I conclude [Detective] Dombayci had an objective, reasonable, articulable and particularized suspicion [] that the [d]efendant was armed with a gun inside the fanny pack which he wore across his chest.

. . .

Under all of these circumstances, and having carefully considered the arguments on both sides, I strongly conclude that the State has met its burden and that all of the surrounding circumstances gave the Detective substantial basis to first conclude that [] the [d]efendant was armed, to conduct the frisk of the pack, which then evolved to probable cause to search the fanny pack, as he felt the gun, and escalated to even stronger probable cause, as the [d]efendant swiped the Detective's hand away and began to struggle, ultimately resulting in his arrest. Under all of these circumstances the motion to suppress is denied.

On May 18, 2023, defendant pleaded guilty to count one of the indictment, second-degree unlawful possession of a handgun. He also pleaded

guilty to two counts of third-degree possession of CDS as charged under Passaic County Indictment Nos. 22-08-0937 and 22-09-1015.

On June 7, 2023, the court sentenced defendant in accordance with the plea agreement to an aggregate seven-year state prison term subject to a forty-two-month parole disqualifier under the Graves Act, N.J.S.A. 2C:43-6(c), for the gun charge, and concurrent three-year terms for each of the CDS offenses. This appeal followed.

On appeal, defendant raises a single argument for our consideration:

> TRIAL COURT ERRED WHEN IT DETERMINED THAT THE DETECTIVE HAD REASONABLE AND ARTICULABLE SUSPICION TO STOP DEFENDANT AND FRISK HIS BAG FOR THE PRESENCE OF A FIREARM.

I.

In our review of a court's denial of a motion to suppress evidence, "our scope of review . . . is limited." State v. Ahmad, 246 N.J. 592, 609 (2021). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). The court's factual findings must be given deference and should only be set aside when they are "clearly mistaken." State v. Zalcberg, 232 N.J. 335, 344 (2018)

(quoting State v. Hubbard, 222 N.J. 249, 262-63 (2015)).  We owe no such deference to a trial court's legal interpretations, which we review de novo. State v. Hathaway, 222 N.J. 453, 467 (2015).

Generally, warrantless searches and seizures are per se unreasonable and prohibited under the United States and New Jersey Constitutions absent a recognized exception to the warrant requirement.  State v. Smart, 253 N.J. 156, 164-65 (2023).  One such exception is the investigative or Terry stop exception, "which is a procedure that involves a relatively brief detention by police during which a person's movement is restricted."  State v. Goldsmith, 251 N.J. 384, 399 (2022) (citing State v. Rosario, 229 N.J. 263, 272 (2017)). "An investigative stop or detention does not offend the Federal or State Constitution, and no warrant is needed, 'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.'"  Ibid. (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)) (quoting Terry, 392 U.S. at 21). Reasonable suspicion "is a less demanding standard than probable cause." Ibid.  However, "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith" will satisfy this constitutional requirement.  Ibid. (quoting State v. Arthur, 149 N.J. 1, 8 (1997)).

A-3325-22

"[I]n determining the lawfulness of an investigatory stop, a reviewing court must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). Thus, a judge must consider the entire picture rather than each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (citing District of Columbia v. Wesby, 583 U.S. 48, 60 (2018)). "[T]he touchstone for evaluating whether police conduct has violated constitutional protections is reasonableness." State v. Bard, 445 N.J. Super. 145, 157 (App. Div. 2016) (internal quotation marks omitted).

A Terry stop and the frisk are analyzed under separate standards. Terry, 392 U.S. at 27. "The first component of the Terry rule concerns the level of reasonable suspicion that must exist before an 'investigatory stop' legitimately may be undertaken." State v. Thomas, 110 N.J. 673, 678 (1988). Our Supreme Court has stated that a police officer may conduct an investigatory stop if, "based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in,

or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002).

However, no one fact is issue-dispositive on what constitutes "reasonable and particularized suspicion" to conduct a stop. "Our jurisprudence is well-settled that seemingly furtive movements by [a] suspect, without more, are insufficient to constitute reasonable and articulable suspicion." Goldsmith, 251 N.J. at 400 (internal citations omitted). Likewise, "a stop in a high-crime area does not by itself justify a Terry frisk." State v. Valentine, 134 N.J. 536, 547 (1994) (internal citation omitted); Goldsmith, 251 N.J. at 400 (quoting State v. Chisum, 236 N.J. 530, 549 (2019) ("[j]ust because a location to which police officers are dispatched is a high-crime area does not mean that the residents in that area have lesser constitutional protection from random stops."). Instead, "[f]acts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate." State v. Nishina, 175 N.J. 502, 511 (2003).

"To conduct a frisk, the officer must be able 'to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.'" Thomas, 110 N.J. at 678 (citing Terry, 392 U.S. at 27). Much like in initiating a Terry stop, an officer must have a "specific and particularized basis for an

objectively reasonable suspicion that defendant was armed and dangerous." Id. at 683. "The existence of an objectively reasonable suspicion is based on the totality of the circumstances." State v. Roach, 172 N.J. 19, 27 (2002) (citing Valentine, 134 N.J. at 546). In contrast to the analysis for a Terry stop, the totality of the circumstances for a frisk may include facts adduced after initiating the stop. See Valentine, 134 N.J. at 551 (upholding a frisk after a stop based in part on that defendant's refusal to remove his hands from his pockets and refusal to make eye contact with the officer).

Defendant argues that Detective "Dombayci stopped [him] based on an inarticulate hunch that he was armed with a gun." He further argues that "[t]here were no intervening facts between [Detective] Dombayci's stop [] and the protective search that would have provided the detective with the reasonable belief that [he] was armed." Defendant maintains his (1) innocuous act of tapping once or twice on his bag; (2) the location in a high-crime area during the daytime, and (3) the detective's knowledge of his prior offense, "when collectively considered, were not facts that suggested that [he] was engaged in criminal activity." He further argues that the Detective's testimony on hotspots is too generic and should be "given little weight in the totality-of-the-circumstances calculation."

14

The State does not dispute, and the evidence otherwise establishes, that Detective Dombayci conducted a Terry stop of defendant when he exited the police vehicle and ordered defendant to raise his hands. See Rodriguez, 172 N.J. at 128 (stating the standard for the start of an investigatory detention is whether a "reasonable person in defendant's position would have felt free to exit the encounter."). Thus, we first consider defendant's claim the court erred by finding the detective had a reasonable and articulable suspicion defendant was in possession of a handgun at the moment he had ordered defendant to raise his hands.

The State does not contend defendant's presence in the hotspot and prior arrest for possession of a handgun constituted a totality of circumstances supporting a reasonable and articulable suspicion defendant unlawfully possessed a handgun. See State v. Chisum, 236 N.J. at 549 ("Just because a location to which police officers are dispatched is a high-crime area does not mean that the residents in the area have lesser constitutional protection from random stops." (quoting State v. Shaw, 213 N.J. 398, 420 (2012))). And, we otherwise find that those circumstances alone are insufficient to support a reasonable and articulable suspicion defendant unlawfully possessed a handgun. To conclude otherwise would be to illogically and unconstitutionally

15

permit <u>Terry</u> stops of any individual with a prior criminal record for unlawful possession of a weapon who happens to be present in what the police consider a hotspot. <u>See generally</u> <u>Goldsmith</u>, 251 N.J. at 400. The validity of the <u>Terry</u> stop therefore turns on whether Detective Dombayci's observation of defendant tapping his fanny pack, when added to these other circumstances, created the reasonable and articulable suspicion necessary for the stop.

We have no quarrel with the motion court's decision to accept as credible Detective Dombayci's testimony that he observed defendant tap the fanny pack—once or twice—because the court has "a better perspective than a reviewing court in evaluating the veracity of a witness." <u>Gnall v. Gnall</u>, 222 N.J. 414, 428 (2015). The issue before us, however, is whether the detective's observation of defendant's tap(s) of the fanny pack, and his opinion the tap(s) constituted defendant's subconscious acknowledgement he possessed a firearm, coupled with the other circumstances—the hotspot and plaintiff's arrest a year earlier for possession of a handgun—supported a reasonable suspicion defendant was in possession of a handgun such that the <u>Terry</u> stop was lawful.

When determining if an officer's observations support a reasonable and articulable suspicion of criminal activity for a <u>Terry</u> stop, consideration must be given to whether what is observed, when viewed in the context of the

16

officer's training and experience, supports a reasonable inference the defendant is engaged in criminal activity. See Arthur, 149 N.J. at 10; accord Davis, 104 N.J. at 503 (explaining an officer's observations "in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts," may support a reasonable and articulable suspicion of criminal activity).

In Arthur, the Court addressed an investigative stop made by officers who were surveilling a heavy narcotics area and observed a passenger enter the defendant's car and then exit with a paper bag that the passenger did not initially have upon getting into the car. The Court considered whether the passenger's "furtive movements" upon exiting that defendant's car was sufficient to justify the stop of the defendant. Id. at 10. The Court ascribed significance to "the rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise," and concluded the Terry stop of the defendant was justified. Id. at 10-11. The Court held, "[w]e are satisfied that the trial court correctly determined that the facts, apart from the drug paraphernalia seized from the passenger, as observed by [the detective] in light of his experience, objectively gave rise to a

17

reasonable suspicion that defendant was engaged in illegal narcotic activity." Id. at 11-12.

Applying the standard employed by the Court in Arthur, we are not convinced Detective Dombayci's interpretation of defendant's tap(s) of the bag as a subconscious sign the bag contained an illegal firearm is supported any rational inferences that was the case. We appreciate the detective testified he had been trained to recognize such tapping as a subconscious indication a bag may contain a handgun, but the record lacks any evidence the training was of such a trustworthy or reliable nature such that it should and could have been correctly relied on by the detective to support an objectively reasonable inference that defendant's tap(s) of the bag reflected his subconscious acknowledgement he was in possession of a handgun.

In State v. Maryland, the Court held that an officer's observations of a defendant who was exiting a commuter train and placing a brown paper bag in the waistband of his pants was insufficient under Terry to support a reasonable, articulable position to initiate an investigatory stop because it was based on an inarticulate hunch. 167 N.J. 471, 477, 486 (2001). There, the Court found significant that the officers were not on narcotics-surveillance

18

duty, "observed nothing suggesting that a drug transaction had taken place" and the train station was not a high drug traffic area.  Id. at 487.

In Rosario, the Court recognized that nervous behavior or lack of eye contact with police cannot drive the reasonable suspicion analysis, given the wide range of behaviors exhibited by different people for varying reasons and under different circumstances while in the presence of police.  229 N.J. at 277. The Court noted that the defendant's otherwise innocuous activity—"'scuffling around' and leaning toward the passenger seat" of a car as the police approached the vehicle with a flashlight—was untethered to any "corroborated criminal activity" and did "not provide a reasonable basis to suspect criminality."  Id. at 277-78.

Here, as in Rosario, there is no evidence of any corroborated criminal activity associated with defendant's presence on the street as the police approached and as Detective Dombayci observed defendant tap the fanny pack one or twice.  And, as the Court explained in Rosario, even where an officer observes what might be considered to be a defendant's furtive motions, "an officer's safety concerns based on [those] asserted . . . movements . . . cannot provide a reasonable and articulable suspicion to support a detention in the first instance."  Id. at 277.  Nor did the fact that defendant tapped the bag in

response to seeing the officers support a reasonable and articulable suspicion that defendant was engaged in criminal activity or—as the State contends here—that defendant was in possession of a firearm. "Nervousness and excited movements are common responses to unanticipated encounters with police officers" and therefore furtive gestures alone "do not give rise to an articulable suspicion suggesting criminal activity." Id. at 277 (State v. Lund, 119 N.J. 35, 47 (1990)).

In our view, an officer's broad and general reference to training and experience does not usurp these constitutional principles or convert the innocuous tapping of a bag into a furtive movement that revealed a defendant's subconscious confirmation the bag he held contained a handgun.[4] Stated differently, in the absence of some other evidence of criminal activity beyond an individual's mere presence in a hotspot or prior record for possession of a weapon, we are not persuaded the mere tapping of a bag may be properly interpreted as a subconscious disclosure the bag contains contraband, never mind an illegal handgun, supporting a reasonable and articulable suspicion

---

[4] We note the record is bereft of any expert testimony in an area of expertise found to be reliable establishing that an individual who taps a bag in response to seeing the police has subconsciously acknowledged the bag contains a handgun. See generally State v. Olenowski, 253 N.J. 133, 139 (2023) (explaining standard for admission of expert testimony).

permitting a <u>Terry</u> stop or pat-down frisk for weapons. <u>See</u> <u>State v. Nyema</u>, 249 N.J. 509, 534 (2022) (explaining "a suspect's conduct can be a factor, but when the conduct in question is an ambiguous indicator of involvement in criminal activity and subject to many different interpretations, that conduct cannot alone form the basis for reasonable suspicion").

We have considered the totality of the limited circumstances on which the State relies to support its claim the officers had a reasonable and articulable suspicion of criminal activity supporting the <u>Terry</u> stop of defendant. However, for the reasons we have explained, we conclude the fact that defendant was present in a hot spot and had a prior firearms possession record does not provide a sufficiently objective reasonable inference defendant was in possession of a handgun, and defendant's tap(s) of the bag added nothing to calculus. As the Court explained in <u>Nyema</u> in a somewhat different context, where the factors relied on by the State do not add up to a totality of circumstances sufficient to establish a reasonable suspicion of criminal activity, "[z]ero plus zero will always equal zero. To conclude otherwise is to lend significance to 'circumstances [which] describe a very large category of presumably innocent travelers' and subject them to 'virtually random seizures.'" 249 N.J. at 534-35 (quoting <u>State v. Morgan</u>, 197 Wis.2d 200, 223

<span>A-3325-22</span>

(1995) (Abrahamson, J., dissenting) (second alteration in original))). Here, we apply the same principle and determine that to conclude the State's reliance on the tapping of the bag as the fact that tipped the scales in support of a reasonable and articulable suspicion defendant possessed a handgun would subject individuals with prior criminal records who are found in a hot spot to unreasonable and unconstitutional random <u>Terry</u> stops and subsequent frisks.

Because the <u>Terry</u> stop of the defendant was unlawful, the evidence seized during the subsequent frisk was also unlawful. <u>See</u> <u>Elders</u>, 192 N.J. at 247 ("An investigative detention that is premised on less than reasonable and articulable suspicion is an 'unlawful seizure,' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule."). We therefore reverse the court's order denying defendant's motion to suppress the handgun and any other evidence seized from defendant, vacate defendant's conviction and sentence under Indictment No. 22-08-0988, and remand for further proceedings. Because we have determined the investigatory detention of defendant was unlawful, it is unnecessary that we address defendant's claim the frisk and search of the bag was otherwise unlawful. <u>Goldsmith</u>, 251 N.J. at 406.

Reversed in part, vacated in part, and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23                                                          A-3325-22