**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4602-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DEMITRI NEIVES, a/k/a
DEMITRI R. NIEVES,

     Defendant-Appellant.

_____

Submitted January 3, 2022 – Decided January 31, 2022

Before Judges Sumners and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-10-1430.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress the sawed-off shotgun he discarded as he and his two codefendants fled from a police officer, defendant Demitri Neives pleaded guilty to second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1). The court sentenced defendant to a seven-year prison term with a five-year period of parole ineligibility. Defendant appeals from the order denying his motion to suppress the evidence, and his judgment of conviction and sentence.

Defendant argues the court erred by denying his motion to suppress because he was unlawfully seized by the police before he discarded the sawed-off shotgun. Defendant's challenge to his sentence is primarily founded on the claim that recently enacted mitigating sentencing factor fourteen, N.J.S.A. 2C:44-1(b)(14)—"[t]he defendant was under twenty-six years of age at the time of the commission of the offense"—should be applied retroactively to the imposition of his sentence because he was twenty-four when he committed his offense. Alternatively, he argues the court erred by failing to consider the non-statutory mitigating factor of his relative youth. Unpersuaded by defendant's arguments, we affirm.

I.

A grand jury returned a seven-count indictment charging defendant with third-degree unlawful possession of a shotgun without a firearms purchaser identification card, N.J.S.A. 2C:58-3, 2C:39-5(c) (count three); third-degree unlawful possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b) (count four); fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1 (count five); first-degree possession of a shotgun by a person previously convicted of robbery, N.J.S.A. 2C:58-3, 2C:39-5(c), and 2C:39-5(j) (count six); and second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1) (count seven). The grand jury charged codefendants, Hussein Hussein and Justin Aponte, in the same indictment with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (counts one and two), and with fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1 (count five).

Defendants filed motions to suppress evidence—guns and clothing—seized by Perth Amboy Police during the early morning hours of August 10, 2018. During a joint hearing on the suppression motions, Perth Amboy Police Sergeant Pascal Medina, Jr. testified that at 2:05 a.m. on August 10, 2018, he was on patrol in a marked policed car driving westerly on Market Street in Perth Amboy. He observed "three individuals" walking westbound—in the same

direction he drove—"wearing sweaters with their hoods over their heads," long pants, and one with an orange shirt or scarf around his face.

Medina did not see anything in the hands of the three individuals, but he considered their clothing unusual given the temperature and time. It was a "hot August" morning and the driver's side window of Medina's patrol car was open. As he passed the individuals, Medina slowed to "maybe ten miles an hour" and the men made eye contact with him. Medina also heard a "large noise of a . . . heavy object hitting the ground." Suspicious, Medina decided to make a U-turn at the next intersection—at Market and 2nd Streets—to further observe the three men.

The individuals watched Medina, and, as he began to make the U-turn, they "began to run at a high pace—rate" in the opposite direction—easterly— from which they had been walking. Medina watched the men run down Market Street away from 2nd Street and towards 1st Street. Medina completed the U-turn and began following the men as they ran. He was approximately half a block away from them when they turned the corner onto 1st Street and continued running. As they turned onto 1st Street, he saw them discard some of their clothing as they ran.

4

Medina sped up to close the distance between himself and the individuals as they ran, but he did not activate his siren or lights or issue any commands as he followed them. As he turned his patrol car onto 1st Street, Medina observed the individuals split up. Defendant ran down the driveway of a 1st Street residence and the codefendants ran down the driveway of another. At that point, Medina lost sight of all of them.

Medina had "other patrolling units set a perimeter" around the area. Defendant was found underneath the front porch of a residence. He was escorted from the porch and secured. When asked why he ran, defendant said he had an active warrant, but a subsequent check revealed that was not true.

After defendant was secured, Medina returned to Market Street where he "believed [he] heard something hit the ground." He found a sawed-off shotgun underneath a parked vehicle. After the shotgun was located, the codefendants were taken into custody two blocks away. At the rear of the 1st Street residence where Medina had seen the codefendants run down the driveway, a Glock handgun, a revolver, and an orange shirt were recovered.

In a detailed bench opinion, the court found defendants were not seized by the police when they began to run on Market Street and subsequently discarded their clothes, the sawed-off shotgun, and two handguns that were

5

recovered.[1] The court found no seizure had taken place when Medina followed defendants as they ran down Market Street and 1st Street. The court determined that prior to defendants' discard of the seized evidence, Medina had not done "anything that could . . . be characterized as a seizure. He was just there. And they ran from him. And then he decided to follow them." The court also noted defendants ran before Medina completed the U-turn and began to follow them, and he never commanded them to stop, or activated the lights or siren on his patrol car. The court found defendant was first seized by the police when he was "pulled . . . out from under the porch[,]" but by that point "all the physical evidence was jettisoned."

The court noted the distance between where defendant left the shotgun and where he was found, and that the shotgun was left in a public place. The court concluded defendant abandoned the shotgun. The court also determined defendant had no reasonable expectation of privacy in the discarded evidence.

---

[1] In part, the court relied on a surveillance video recording from Market Street that showed defendants first walking westerly on Market Street and then turning and running in the opposite direction toward 1st Street. The recording shows one of the individuals holding a sawed-off shotgun, and, during his plea proceeding, defendant testified he was the individual shown "on the camera walking down the street with [the] sawed-off shotgun[.]"

6

The court found defendants' abandonment of the evidence was not the product of an unlawful seizure, and the evidence was abandoned before defendant was seized by the police on 1st Street. The court determined there were no grounds to suppress the evidence.

Although unnecessary to its denial of the suppression motion, the court further found that even if Medina's actions constituted a seizure of defendant at the time he discarded the shotgun, there were sufficient "particularized facts" supporting a "reasonable and articulable suspicion" for a lawful investigatory stop at that time. Thus, the court found suppression of the evidence was not required because Medina had proper basis to conduct an investigatory stop of defendants before they fled and discarded the evidence.

The court entered an order denying defendants' suppression motion. Defendant subsequently pleaded guilty to second-degree certain persons not to have a weapon—the sawed-off shotgun—in exchange for the State's recommendation of a sentence not to exceed ten years with a five-year period of parole ineligibility. On July 31, 2020, the court sentenced defendant to a seven-year prison term with a five-year period of parole ineligibility.

More than two-and-a-half months later, on October 19, 2020, an amendment to the sentencing guidelines under N.J.S.A. 2C:44-1 became

effective immediately upon its adoption.  L. 2020, c. 110 §1.  The amendment

added an additional mitigating factor, N.J.S.A. 2C:44-1(b)(14), requiring

consideration of a defendant's youth as a mitigating factor if a "defendant was

under [twenty-six] years of age at the time of the commission of the offense."

As noted, defendant appealed from the court's order denying his

suppression motion, and from his conviction and sentence.  Defendant presents

the following arguments for our consideration:

> POINT I
>
> BY CHASING A PEDESTRIAN DOWN IN POLICE
> VEHICLES AND FORMING A PERIMETER TO
> BLOCK HIS FREEDOM OF MOVEMENT,
> OFFICERS ILLEGALLY SEIZED HIM WITHOUT
> ANY CAUSE TO SUSPECT THAT HE HAD
> COMMITTED A CRIME.  THIS COURT SHOULD
> THUS REVERSE THE DENIAL OF THE MOTION
> TO SUPPRESS THE FRUIT OF THAT ILLEGAL
> SEIZURE. U.S. Const., Amends. IV, XIV; N.J. Const.,
> Art. 1, Par. 7.
>
> POINT II
>
> THE LAW REQUIRING SENTENCING
> MITIGATION FOR YOUTHFUL DEFENDANTS
> DEMANDS RETROACTIVE APPLICATION
> BECAUSE THE LEGISLATURE INTENDED IT,
> THE NEW LAW IS AMELIORATIVE IN NATURE,
> THE SAVINGS STATUE IS INAPPLICABLE, AND
> FUNDAMENTAL FAIRNESS REQUIRES
> RETROACTIVITY.  ADDITIONALLY, YOUTH

SHOULD HAVE BEEN CONSIDERED AS A NON-STATUTORY MITIGATING FACTOR.

A. The Legislature Intended Retroactive Application[.]

    1. The Legislature did not express a clear intent for prospective application only.

    2. The other language of the mitigating factor amendment indicates retroactive application; the presumption of prospective application is inapplicable; and the law is clearly ameliorative.

    3. There is no manifest injustice to the State in applying the mitigating factor retroactively[.]

B. The Savings Statute Does Not Preclude Retroactive Application of the Ameliorative Legislative Changes, Like the One at Issue Here.

C. Retroactive Application of the Mitigating Factor Is Required as a Matter of Fundamental Fairness, and to Effectuate the Remedial Purpose of the Sentencing Commission's Efforts Regarding Juvenile Sentencing.

D. Even If This Court Does Not Apply the Statutory Mitigating Factor Retroactively, the Sentencing Court Still Erred by Failing to Consider Youth as a Non-Statutory Mitigating Factor.

## II.

Defendant argues the court erred by denying his suppression motion because he was unlawfully seized by Medina prior to his discard of the sawed-off shotgun. He claims he was seized without the requisite reasonable and

9

articulable suspicion of criminal activity and the seizure "caused [him] to jettison personal property." He contends the court erroneously concluded he was not seized "in the constitutional sense" by Medina's pursuit of him and his codefendants.

When reviewing a trial court's denial of a motion to suppress physical evidence, "our scope of review . . . is limited." State v. Ahmad, 246 N.J. 592, 609 (2021). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Factual findings of the trial court are given deference and should only be set aside when those findings are "clearly mistaken." State v. Zalcberg, 232 N.J. 335, 344 (2018) (quoting State v. Hubbard, 222 N.J. 249, 262-63 (2015)). We owe no such deference to a trial court's legal interpretations, which are reviewed de novo. State v. Hathaway, 222 N.J. 453, 467 (2015).

The United States and New Jersey Constitutions guarantee that individuals shall be free from "unreasonable searches and seizures." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "Generally, a warrantless . . . seizure is invalid absent a showing that it 'falls within one of the few well-delineated exceptions

to the warrant requirement.'" State v. Alessi, 240 N.J. 501, 517 (2020) (quoting State v. Mann, 203 N.J. 328, 337-38 (2010)).

One exception to the warrant requirement is an investigative detention. Id. at 517-18. Because an investigative detention is a temporary seizure, "it must be based on an officer's 'reasonable and particularized suspicion' . . . that an individual has just engaged in, or was about to engage in, criminal activity." State v. Rosario, 229 N.J. 263, 272 (2017) (alteration in original) (quoting State v. Stovall, 170 N.J. 346, 356, (2002)).

Where an investigative detention is not based on sufficient reasonable and particularized suspicion, it is an "'unlawful seizure' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule." State v. Chisum, 236 N.J. 530, 546 (2019) (quoting Elders, 192 N.J. at 247 (2007)). The exclusionary rule generally requires the "suppression of . . . evidence obtained improperly." State v. Smith, 212 N.J. 365, 388 (2012).

A seizure, in the form of an investigative detention, occurs "when 'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" Rosario, 229 N.J. at 272 (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). "In determining whether a seizure occurred, a court must consider whether 'in view of all of the circumstances surrounding the incident, a

reasonable person would have believed that he [or she] was not free to leave.'" Stovall, 170 N.J. at 355 (alteration in original) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). This determination requires an objective consideration of the "totality of the circumstances surrounding detention." Ibid.

Where property has been abandoned "a defendant will not have standing to object to the search or seizure of" that property. State v. Johnson, 193 N.J. 528, 548-49 (2008). "For the purposes of standing, property is abandoned when a person, who has control or dominion over property, knowingly and voluntarily relinquishes any possessory or ownership interest in the property and when there are no other apparent or known owners of the property." Id. at 549. However, the Court has held that where items are discarded in response to an illegal seizure, that evidence is not abandoned, and remains subject to suppression. State v. Tucker, 136 N.J. 158, 172 (1994). As the Court explained in Tucker,

> "[p]roperty is not considered abandoned when a person throws away incriminating articles due to the unlawful actions of police officers." Thus, where a person has disposed of property in response to a police effort to make an illegal arrest or illegal search, courts have not hesitated to hold that property inadmissible.
>
> [Ibid. (quoting 1 Wayne R. LaFave, Search and Seizure § 2.6(b), at 471-72 (2d ed. 1987)).]

12

Measured against these principles, we discern no basis to reverse the court's determination defendant was not seized prior to his discard of the sawed-off shotgun. Medina's actions prior the defendant's discard of the gun on Market Street did not create any circumstances in which "a person in such a situation would [not] reasonably feel free to 'terminate the encounter.'" Id. at 166 (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)).

Medina had not completed the U-turn in the patrol car when defendant and his codefendants turned and ran on Market Street, and it was at that time defendant discarded the shotgun. Prior to defendant's discard of the shotgun, Medina had not activated the patrol car's lights or siren. He had not issued any commands to defendants. He had not taken any action to restrict defendant's movements. When defendant discarded the shotgun and ran, Medina had done nothing more than drive his marked patrol car down the street and begin a U-turn. Indeed, even after defendants turned and ran down Market Street and onto 1st discarding evidence, including the shotgun, clothes, and handguns later recovered, Medina did nothing more than follow them in his patrol car. Medina took no actions that would cause "'an objectively reasonable person' [to] feel 'that his or her right to move has been restricted.'" Rosario, 229 N.J. at 272 (quoting Rodriguez, 172 N.J. at 126). Thus, defendant was not seized by Medina

13

when he discarded the shotgun on Market Street and ran with his codefendants toward, and onto, 1st Street.

We are not persuaded by defendant's reliance on the Court's decision Tucker in support of his claim he was unlawfully seized at the moment he discarded the shotgun. In Tucker, the defendant sat on the curb at the rear of a house when he saw a police car. 136 N.J. at 162. He "quickly stood up, turned and started running through the yard toward the front of the property," and the officer in the police car "immediately radioed a description of the fleeing [defendant] to officers in [a] second patrol car." Ibid. When the defendant reached the street at the front of the property, "the second patrol car intercepted him." Ibid. An officer in the second patrol "began to pursue" the defendant, who "turned around and ran back toward the rear of the yard." Ibid. As the defendant ran back into the yard, he dropped a plastic bag containing drugs, and was intercepted by an officer from the first police car, "who stopped him." Ibid.

The Court explained that given those circumstances, a seizure had occurred because the actions of the police "would cause a reasonable person to believe that the police wanted to capture him and not just to speak with him[,]" and "a person in such a situation would [not] reasonably feel free to 'terminate the encounter.'" Id. at 166 (quoting Bostick, 501 U.S. at 436). The Court also

held the defendant's mere flight from the presence of the police, without more, did not support a reasonable and articulable suspicion of criminal activity permitting the seizure of defendant and, for that reason, the evidence the defendant discarded following the seizure must be suppressed.  Id. at 173.

The Court further noted that "[n]ot every police pursuit is a seizure," id. at 167, and it cited Michigan v. Chesternut, 486 U.S. 567 (1988), as an example of a police pursuit that did not result in a seizure.  Tucker, 136 N.J. at 167.  In Chesternut, the United States Supreme Court considered whether a defendant who stood, turned, "and began to run" when he saw a patrol car approaching, had been seized when the patrol car caught up to him and drove alongside him "for a short distance" as he ran.  486 U.S. at 569.  The officers in the patrol car observed the defendant discarding "a number of packets" pulled from his pocket as they drove parallel to him.  Ibid.  Upon discovering the packets contained drugs, the officers arrested the defendant for possession.  Ibid.

The Court explained there was no evidence "the police activated a siren or flashers; . . . commanded [the defendant] to halt, . . . displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement[,]" and concluded "this kind of police presence does not, standing alone, constitute a

15                                                                A-4602-19

seizure." Id. at 575-76; see also State v. Hughes, 296 N.J. Super. 291, 297-98 (App. Div. 1997) (finding no seizure where a police officer in a patrol vehicle merely followed the defendant as he rode his bicycle and discarded a bag of drugs). The Court found the police "were not required to have 'a particularized and objective basis for suspecting [the defendant] of criminal activity,' in order to pursue him" because the conduct of the police did not result in a seizure. Chesternut, 486 U.S. at 576 (quoting United States v. Cortez, 449 U.S. 411, 417-418 (1981)).

Here, Medina had not even begun a pursuit when defendant discarded the shotgun. Medina's actions prior to defendant's discard of the shotgun do not rise to the level of the pursuits in Chesternut and Hughes, where it was determined the actions of the police did not constitute a seizure. See ibid.; Hughes, 296 N.J. Super. at 297-98. And, unlike the defendant in Tucker, defendant was not "chased by a patrol car [and] also blocked in by other patrol cars and thus trapped." Hughes, 296 N.J. Super. at 297; see also Tucker, 136 N.J. at 162. Defendant did not have an encounter with Medina prior to his discard of the shotgun. Defendant tossed the shotgun to the ground and ran at the mere sight of Medina in his patrol car. The record lacks any evidence that at the time defendant discarded the shotgun and ran, Medina had taken any action that

A-4602-19

"would . . . have communicated to a reasonable person an attempt to capture or otherwise intrude upon defendant's freedom of movement," Hughes, 296 N.J. Super. at 296, or would have caused "'an objectively reasonable person' [to] feel 'that his or her right to move has been restricted,'" Rosario, 229 N.J. at 272 (quoting Rodriguez, 172 N.J. at 126). The motion court correctly determined defendant was not seized by the police prior to his discard of the shotgun.

We also agree with the court's finding defendant abandoned the shotgun. The evidence supports the court's determination defendant "knowingly and voluntarily relinquishe[d]" whatever possessory interest he may have had in the shotgun when he discarded it in a public place on Market Street and fled at a high rate of speed around the corner and down 1st Street. Johnson, 193 N.J. at 549. Because defendant was not unlawfully seized before he discarded the shotgun on Market Street, defendant's discard of the gun constituted abandonment. Tucker, 136 N.J. at 172. As a result of his abandonment of the shotgun, defendant had "no right to challenge the search and seizure of that property." Johnson, 193 N.J.at 548.

Accordingly, we affirm the court's order denying defendant's motion to suppress the evidence he discarded on August 10, 2018. The record supports

17

the court's findings of fact and legal conclusion defendant was not seized prior to his abandonment of the evidence.[2]

### III.

Defendant also challenges the court's imposition of sentence. He claims the court erred by failing to consider his relative youth—he was twenty-four at when he committed the offense—as a non-statutory mitigating factor in the court's sentencing calculus. He also claims the matter should be remanded for resentencing based on the enactment of mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), "[t]he defendant was under [twenty-six] years of age at the time of the commission of the offense." N.J.S.A. 2C:44-1(b)(14) became effective on October 19, 2020, L. 2020, c. 110 §1, two-and-a-half months after defendant's July 2020 sentencing, but he argues it should be given pipeline retroactivity and, as a result, a remand is required for the court to consider the statutory mitigating factor in its determination of defendant's sentence.

---

[2] Because we are convinced defendant was not seized by the police prior to his abandonment of the shotgun, it is unnecessary to address defendant's challenge to the court's determination there was evidence supporting a reasonable and articulable suspicion of criminal activity supporting an investigatory stop of defendant at the time he discarded the shotgun and began running down Market Street. We offer no opinion on the issue.

A-4602-19

Defendant pleaded guilty to second-degree possession of a weapon—a sawed-off shotgun—in accordance with a plea agreement pursuant to which the State agreed to recommend a sentence not to exceed ten years with a mandatory five-year period of parole ineligibility. See N.J.S.A. 2C:39-7(b)(1) (providing in part that the term of imprisonment of a person who has previously been convicted of robbery and is subsequently convicted of unlawful possession of a firearm shall include a minimum parole ineligibility term of five years). At sentencing, the court found defendant had seven juvenile adjudications, including three adjudications for probation violations, and three prior criminal convictions: two for aggravated assault and one for robbery. The court also noted defendant's substance abuse history, employment history, "ties to" a street gang, marital status (single), and that he had no children.

The court found aggravating factor six, the extent and seriousness of defendant's prior record, N.J.S.A. 2C:44-1(a)(6), and aggravating factor nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The court did not find aggravating factor three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), because it accepted defendant's statements that he regretted his involvement in the commission of the offense; his participation in the commission of the offense was in part based

19

on his loyalty to his street gang; and his declaration he decided he would have no further involvement in the street gang "way of life" in the future. The court did not find any mitigating factors and determined the aggravating factors outweighed the mitigating factors.

The court imposed a sentence less than that authorized by the plea agreement. The court noted defendant's representations that during the two years he spent incarcerated following his arrest, he learned there was no loyalty among members of a street gang, and he determined he would no longer participate in a street-gang lifestyle. Based on defendant's representations, the court believed defendant was a "person of [his] word" who did not "necessarily" present "a risk of commission of another offense." Although the court found the aggravating factors outweighed the mitigating factors, the court imposed a mid-range seven-year term with the mandatory five-year period of parole ineligibility.

Our review of a court's sentencing decision is "deferential." State v. Case, 220 N.J. 49, 65 (2014). A reviewing court "will not 'substitute [its] judgment for that of the sentencing court.'" State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a sentence "if: (1) the trial court followed the sentencing guidelines; (2) its findings of fact

and application of aggravating and mitigating factors were 'based upon competent credible evidence in the record;' and (3) 'the application of the guidelines to the facts' of the case does not 'shock[] the judicial conscience.'" State v. A.T.C., 454 N.J. Super. 235, 254 (App. Div. 2018) (alteration in original) (quoting State v. Bolvito, 217 N.J. 221, 228 (2014)).

In the cases relied on by defendant, a defendant's relative youth has been recognized as an appropriate, but not statutorily mandated, consideration in sentencing. For example, in its review of an extended term sentence for a twenty-two-year-old defendant, our Supreme Court noted the "defendant's relative youth ordinarily would inure to his benefit in evaluating the choice of [an] extended sentence." State v. Dunbar, 108 N.J. 80, 95 (1987). However, the Court found consideration of the defendant's youth was tempered by his resistance to "prior efforts at reform." Ibid. Although we have found a defendant's youth is "not one of the delineated statutory mitigating factors," we have noted a sentencing court's failure to give "consideration to [the] defendant's youth."[3] State v. Pindale, 249 N.J. Super. 266, 289 (App. Div. 1991). In State v. Tanksley, we similarly suggested that on a remand for the resentencing of a

---

[3] As we have noted, a defendant's youth under the age of twenty-six became a statutory mitigating factor on October 19, 2019, with the enactment of N.J.S.A. 2C:44-1(b)(14).

seventeen-year-old defendant on an aggravated manslaughter conviction, the trial court should consider that the "defendant's relative youth would ordinarily inure to his benefit in evaluating" the period of parole ineligibility imposed. 245 N.J. Super. 390, 397 (App. Div. 1991) (quoting Dunbar, 108 N.J. at 95).

The cases relied on by defendant were decided prior to the October 19, 2019 amendment to N.J.S.A. 2C:44-1(b) that added youth—under the age of twenty-six—as a statutory mitigating factor. Addressing the version of N.J.S.A. 2C:44-1(b) extant when defendant was sentenced, the Court in State v. Zuber explained there were "[c]ertain sentencing factors [in N.J.S.A. 2C:44-1(b)] that touch[ed] on a defendant's youthful status," notably mitigating factor four, N.J.S.A. 2C:44-1(b)(4), "[t]here was substantial grounds tending to excuse or justify defendant's conduct, though failing to establish a defense," and mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13), "[t]he conduct of a youthful defendant was substantially influenced by another person more mature than the defendant." 227 N.J. 422, 447 n.2 (2017). The Court, however, also found "youth and its attendant circumstances . . . are not independently weighed as statutory factors" under N.J.S.A. 2C:44-1(b). Ibid. Applying the version of N.J.S.A. 2C:44-1(b) prior to its October 19, 2019 amendment, the Court in State v. Rivera, ___ N.J. ___, ___ (2021) (slip op. at 21), found a defendant's youth

"cannot support an aggravating factor" in a sentencing determination and that, on the resentencing of the defendant who was eighteen years of age when she committed her offenses, the sentencing court "is free to consider [the] defendant's youth at the time of the offense" and apply other statutory mitigating factors supported by the evidence.

Although a court has the "ability to use non-statutory mitigating factors in imposing a sentence," State v. Rice, 425 N.J. Super. 375, 381 (App. Div. 2012), defendant points to no authority mandating that sentencing court do so. Here, defendant did not argue before the sentencing court that his relative age at the time he committed the offense should be considered in mitigation of the sentence to be imposed. And since consideration of defendant's relative youth was not a mandatory sentencing factor under N.J.S.A. 2C:44-1(b) when defendant was sentenced, Zuber, 227 N.J. at 447 n.2, the sentencing court had no independent obligation to consider it in its sentencing determination, cf. State v. Dalziel, 182 N.J. 494, 504-05 (2005) (explaining where a statutory mitigating factor is supported by credible evidence, it must be found and weighed by the court in imposing sentence). We therefore do not consider the merits of defendant's argument the sentencing court erred by failing to consider defendant's relative youth at the time he committed the offense; defendant's relative youth as a non-

statutory mitigating factor was not raised before the sentencing court, and the issue does not "go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

We also observe that even if the sentencing court erred by failing to consider defendant's relative age when he committed the offense, plaintiff failed to demonstrate plain error requiring reversal of his sentence. Under that standard, we disregard any error or omission by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

Any consideration of defendant's relative youth when he committed the offense at the age of twenty-four also required an assessment of defendant's resistance to "prior efforts at reform." Dunbar, 108 N.J. at 95. On that score, defendant performed badly. As the presentence report revealed, defendant has seven juvenile adjudications, including three adjudications for violations of probation and dispositions involving commitments to a youth detention facility. Defendant consistently resisted each of those efforts at reform. After he became an adult, defendant was convicted of three crimes, including two aggravated assaults and one second-degree robbery, and he received state prison sentences

A-4602-19

as a result. Defendant further resisted those efforts at reforming his proclivity for criminal conduct; within thirty days of his release from a five-year prison sentence for robbery, he carried the sawed-off shotgun down Market Street in Perth Amboy for which he was convicted and received the seven-year sentence he challenges on appeal.

Given defendant's consistent resistance to efforts at reforming his conduct through probation and punishment, we are convinced that any consideration that might have properly been given to his relative youth as a mitigating factor would not have affected the court's determination the statutory aggravating factors outweighed the mitigating factors, see N.J.S.A. 2C:44-1(a) and (b), and would not have altered the court's weighing of those factors such that the court committed plain error by imposing the mid-range, seven-year sentence. Indeed, the court's weighing of the aggravating and mitigating factors supported a sentence above the mid-range seven-year term that was imposed. See State v. Natale, 184 N.J. 458, 488 (2005) (explaining when a court weighs aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b), "reason suggests," but does not require "that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range"). Thus,

we discern no basis to conclude that any minor benefit that might have inured to defendant's benefit based on his relative youth would not have altered the court's determination a mid-range seven-year sentence was appropriate and well-supported by the record.

We find no error in the court's finding of the aggravating and mitigating factors, or the court's weighing of the factors to support the sentence imposed. Case, 220 N.J. at 65. Nor does defendant's sentence shock our judicial conscience. Id. For those reasons, we are persuaded the court properly exercised its discretion in imposing the challenged sentence.

Defendant also claims we should reverse his sentence and remand for resentencing because the court is obligated to consider his relative youth as a mandatory statutory mitigating factor under N.J.S.A. 2C:14-1(b)(14). Defendant argues that although the amendment to N.J.S.A. 2C:44-1(b) was not effective until two and a half months after his sentencing, it should be given pipeline retroactivity and therefore requires a remand for resentencing. "Pipeline retroactivity" is the retroactive application of a new law to a case that is in the process of direct appeal, or pipeline, at the time the law became effective. State v. G.E.P., 243 N.J. 362, 370 (2020).

A determination whether a statute applies retroactively "is a purely legal

question of statutory interpretation." State v. J.V., 242 N.J. 432, 442 (2020) (quoting Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016)). In making the determination, "[t]he overriding goal . . . 'is to determine as best [this court] can the intent of the Legislature, and to give effect to that intent.'" Id. at 442 (first alteration in original) (quoting State v. S.B., 230 N.J. 62, 67 (2017)). We must "look to the statute's language and give those terms their plain and ordinary meaning." Ibid.; see Johnson, 226 N.J. at 386 (explaining "the best indicator of that intent is the plain language chosen by the Legislature" (quoting Cashin v. Bello, 223 N.J. 328, 335 (2015))). Where the terms are "clear and unambiguous, then the interpretive process ends, and" this court must "apply the law as written." Id. at 443 (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)). Where "the statutory text is ambiguous, we may resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting S.B., 230 N.J. at 68).

Our Supreme Court has found the Legislature's declaration that a statute is "effective immediately" reflects a determination the statute shall have prospective effect. For example, in Pisack v. B & C Towing Inc., the Court held the Legislature's determination and declaration a statute shall be effective immediately "bespeak[s] an intent contrary to, and not supportive of, retroactive

application." 240 N.J. 360, 371 (2020) (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 48 (2008)). Similarly, in State v. Parolin, the Court held that amendments to the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA), removing the offense for which the defendant was convicted from NERA's coverage, did not apply retroactively because the Legislature provided the amendment would "take effect immediately." 171 N.J. 223, 233 (2002).

We may properly presume the Legislature was fully aware of judicial interpretations of statutory language, N.J. Democratic Party, Inc. v. Samson, 175 N.J. 178, 195 n.6 (2002), and therefore the Legislature understood that, consistent with the Court's decisions in Pisack and Parolin, making N.J.S.A. 2C:44-1(b)(14) "effective immediately" constituted a clear and unambiguous declaration the amendment was prospective only.[4] See Pisack, 240 N.J. at 371; Parolin, 171 N.J. at 233. "Thus, the Legislature is deemed to have been fully aware that," if it sought to make application of mitigating factor prospective, it should not have declared it effective immediately, and "should have expressly provided for such application in the amendment's text." Olkusz v. Brown, 401 N.J. Super. 496, 502 (App. Div. 2008).

---

[4] The Court decided Pisack on January 16, 2020, ten months before the enactment of N.J.S.A. 2C:44-1(b)(14). 240 N.J. at 360. The Court decided Parolin in 2002. 171 N.J. at 233.

The statute also does not include any language suggesting an intent that it apply prospectively or rendering its "effectively immediately" language something other than the declaration of prospective application recognized in Pisack and Parolin. See Olkusz, 401 N.J. Super. at 502 (noting "the Legislature's silence on the question of retroactivity" in the face of canons of statutory construction supporting prospective application "is akin to a legislative flare, signaling to the judiciary that prospective application is intended").

For those reasons, we reject defendant's claim that mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), should be given retroactive application. The clear and unambiguous language used by the Legislature, and as consistently interpreted by our Supreme Court, does not permit an interpretation that the amendment applies retroactively to individuals, like defendant, who were sentenced prior to October 19, 2019. As we recently held in State v. Bellamy, mitigating factor fourteen does not apply retroactively to sentences imposed prior to the effective date of N.J.S.A. 2C:44-1(b)(14), and may properly be applied only to sentencings, including re-sentencings following a remand on appeal, occurring on or after N.J.S.A. 2C:44-1(b)(14)'s October 19, 2019 effective date. 468 N.J. Super. 29, 46-48 (App. Div. 2021).

Because we find the clear and unambiguous language of the statutory amendment does not permit retroactive application under the circumstances presented here, see id. at 48, it is unnecessary to address defendant's remaining arguments supporting its claim the statute should be applied retroactively, see J.V., 242 N.J. at 443 (explaining a court's interpretation of a statute ends where the statute's terms are clear and unambiguous).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4602-19