**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0874-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICHARD R. DRAUGHN,

     Defendant-Appellant.

_____

> Argued December 14, 2021 – Decided February 17, 2022
>
> Before Judges Rothstadt, Mayer and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-02-0242.
>
> Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).
>
> David M. Liston, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; David M. Liston, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

During jury selection, defendant Richard R. Draughn advised the court of numerous concerns related to his appointed counsel's representation and asked for a new lawyer or, in the alternative, to represent himself. The court denied his requests, as well as his application to suppress a gun he discarded and which the police recovered immediately prior to his arrest. He was convicted of simple assault, N.J.S.A. 2C:12-1(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). After merger, the court sentenced defendant to an aggregate eight-year term of imprisonment with four years of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c).

On appeal, he challenges those convictions and his sentence arguing[1]:

> I.  BECAUSE DEFENDANT WAS STOPPED WITHOUT THE REQUISITE REASONABLE SUSPICION, THE EVIDENCE IN THIS CASE MUST BE SUPPRESSED.
>
> II.  DEFENDANT'S REQUESTS TO REPRESENT HIMSELF AND FOR SUBSTITUTE COUNSEL WERE INAPPROPRIATELY DISMISSED

---

[1] We have reorganized defendant's point headings to address the suppression issue first.

A-0874-19

WITHOUT THE APPROPRIATE INQUIRY. HIS CONVICTIONS MUST BE REVERSED.

A. Introduction.

B. The Trial Court's Failure To Conduct The Appropriate Inquiry When Defendant Asked To Represent Himself Or To Even Rule On His Request Requires Reversal Of Defendant's Convictions.

C. The Trial Court's Failure To Conduct The Appropriate Inquiry When Defendant Requested New Counsel Requires Reversal Of Defendant's Convictions.

D. Conclusion.

III.    THE FAILURE TO INSTRUCT THE JURY THAT IT HAD TO BE UNANIMOUS AS TO THE UNLAWFUL PURPOSE WITH WHICH DEFENDANT POSSESSED THE WEAPON OR AS TO THE ACTS THAT CONSTITUTED ASSAULT NECESSITATES REVE[RS]AL OF THOSE CONVICTIONS.

IV.    DEFENDANT'S SENTENCE, OF EIGHT YEARS WITH A FOUR-YEAR PERIOD OF PAROLE INELIGIBLITY, IS EXCESSIVE FOR A PERSON WHO HAD NEVER BEEN CONVICTED OF AN INDICTABLE OFFENSE BEFORE.

Defendant also raises the following argument in his pro se supplemental brief, which we have summarized in the following point heading:

[THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR AN ADVERSE INFERENCE INSTRUCTION REGARDING MISSING FOOTAGE].

After considering these arguments against the record and applicable legal principles, we disagree with defendant's contention in Point I and affirm the court's pretrial determination denying defendant's motion to suppress the gun seized at the time of his arrest. We also reject defendant's argument in his pro se submission.

We agree, however, with defendant's arguments in Point II.B and conclude the court erred by dismissing defendant's request to represent himself without conducting the proper inquiry. We therefore vacate defendant's conviction and remand for a new trial. In light of our decision, we do not reach the additional arguments raised by defendant in Points II.C, III, and IV.

I.

This appeal has its genesis in a physical altercation that occurred in Perth Amboy during the evening of April 17, 2016. On that date, defendant received a call from his girlfriend informing him that her cousin's boyfriend, Carrington "C.J." Gray, "put his hands on" her, attempted to spit in the vehicle in which defendant's girlfriend and stepdaughter were seated, and drove over defendant's girlfriend's foot with a car.

4

Defendant's girlfriend told him they were located at 76 Market Street in Perth Amboy. Defendant arrived at that location with approximately five people and a loaded, unregistered nine-millimeter handgun. As Gray had already left the scene, defendant told his girlfriend to contact him because he "ha[d] to pay for what he did."

Gray returned and an argument ensued where defendant told Gray he was going to "knock him out, straight up." Defendant also pulled out his gun, but testified he kept it "tucked behind [his] leg" and "never . . . pointed it" at Gray.

Gray retreated into a nearby apartment building and once inside the building, punched defendant's girlfriend's cousin who accompanied him inside, which prompted defendant to run into the building and strike Gray in the face, "knock[ing] him out," with defendant and two other individuals thereafter "jump[ing] on" Gray while he was on the ground. A video of a significant portion of the fight was captured on a nearby video surveillance camera and the tape was played for the jury. The two individuals who assaulted Gray then fled the scene on their motorcycles.

Shortly after the altercation ended, Sergeant Nicholas Millroy of the Perth Amboy Police Department, who was in a marked police vehicle, was stopped by a cab driver who, in "broken English," advised him of a disturbance involving a

5

black male. Sergeant Millroy stated he then saw two motorcycles leaving 76 Market Street at a high rate of speed and drove the short distance to that address.

Before doing so, he activated his side, or alley light, on his vehicle, but did not turn on the overhead lights. As he approached 76 Market Street, he saw defendant leaving a building while carrying a motorcycle helmet in his left hand while holding his right hand firmly along the side of his waist area. He focused the spotlight on defendant, pulled the vehicle on the other side of the road closest to him, and observed that defendant "appeared startled" when they made eye contact. He also stated that defendant immediately slowed his gait, and attempted to shield Sergeant Millroy's view by walking beside a parked vehicle.

At that point, Sergeant Millroy still had not activated his overhead lights. In addition, he did not block defendant's movements in any way with his vehicle, give him commands, or speak to him at all. Instead, he parked his vehicle, exited and walked toward defendant to "conduct a field inquiry."

Sergeant Millroy stated at that point he heard "what sounded to be a metal object hit the ground," and witnessed defendant "kick the object underneath the parked vehicle." Based on his training and experience, and the surrounding circumstances, Sergeant Millroy believed defendant had discarded a weapon. He then drew his weapon, ordered defendant to the ground, and called for

6

backup. Officer Jose Santiago responded to Sergeant Millroy's call for backup and proceeded to handcuff and pat down defendant. Sergeant Millroy then observed the gun under the vehicle and Officer Santiago recovered it.

Once the gun was located, defendant was arrested and brought to police headquarters, where he provided a statement detailing the circumstances that led to the altercation with Gray. Defendant also admitted to possessing the gun, which he said was in his pocket as he was leaving the apartment building. He stated that upon seeing Sergeant Millroy, he "dipped behind the car [and] tossed [the gun]."

On February 24, 2017, a Middlesex grand jury charged defendant with: second-degree burglary, N.J.S.A. 2C:18-2(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2); third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1); second-degree unlawful possession of a weapon; and second-degree possession of a weapon for unlawful purposes. In an order dated April 15, 2019, the court granted the State's motion to dismiss counts one, two, four, and five of the indictment leaving for trial the aggravated assault, unlawful possession of a weapon, and possession of a weapon for unlawful purposes charges.

On January 8, 2019, the court held a <u>Miranda</u>[2] hearing and denied defendant's application to suppress his statements to the police, concluding the State established beyond a reasonable doubt that defendant's statements were voluntary and given after he knowingly waived his <u>Miranda</u> rights. At the hearing the court expressly inquired if defendant wished to testify, and he declined.

Prior to trial, defendant also unsuccessfully moved to suppress evidence. The court held a hearing at which Sergeant Millroy testified. As previously noted, he stated he proceeded to 76 Market Street after being advised by the cab driver that there was a "disturbance involving a black male" and after observing two motorcycle riders leaving the area at a high rate of speed.

He testified that he began using his alley light as he was "approaching the area" and that upon observing defendant he "zero[ed] in on him." Sergeant Millroy stated he focused on defendant for a "multitude of reasons," not simply his race, including that motorcycles had fled from the area, defendant was "exiting 76 Market in a hurried pace," and he was holding a motorcycle helmet and headed towards a motorcycle.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

In denying defendant's motion to suppress, the court first found that Sergeant Millroy "was an extremely credible witness" and "accept[ed] Sargent Millroy's facts as being accurate." It found that "[a]s a matter of law, coming up the street . . . with the alley light, getting out of the car, [and] approaching [defendant] has no constitutional implications whatsoever. It is a mere field inquiry." The court also noted that Sergeant Millroy did not order or question defendant as he approached him and reasoned that upon hearing defendant drop something and observing him kick it, Sergeant Millroy had "articulable facts" that gave him "every right to stop [defendant] and detain him."

On May 21, 2019, approximately one week after jury selection began and before opening statements, defendant indicated to the court that he no longer wanted his pool attorney[3] to represent him. He explained that counsel was not a "fit" based on several conflicts that occurred throughout the representation. Specifically, defendant claimed counsel filed motions without consulting him, instructed him not to testify at his Miranda and suppression hearings over his

---

[3] The Office of the Public Defender is authorized to maintain and compensate "trial pools of lawyers" on a case-by-case basis. N.J.S.A. 2A:158A-7(c), (d). Pool attorneys may be engaged "whenever needed to meet case load demands, or to provide independent counsel to multiple defendants whose interests may be in conflict." N.J.S.A. 2A:158A-9; see also State v. Van Ness, 450 N.J. Super. 470, 490 (App. Div. 2017).

A-0874-19

objections, was disrespectful to him, including swearing at him on the phone, and "tr[ied] to manipulate him into saying stuff . . . happened that did not happen." Defendant stated that he could not move forward with counsel and that there was "no way" counsel could help him. He also said he "fe[lt] better off going to trial by [himself] than going with [counsel]."

In response, the court instructed defendant that he had a right to counsel but not "necessarily . . . a right to counsel of [his] choice." It stated that defendant's "complaint would not be something [the court] can deal with" and "it would be up to the Public Defender's Office to deal with [defendant's] issue" but that generally "they have a policy against switching out lawyers at [a] defendant's . . . request." The court also instructed defendant that his request was "a little late" because jury selection had already begun, and the Public Defender's Office "wouldn't be inclined to appoint another lawyer" and switching lawyers "wouldn't be feasible."

Finally, the court said that defendant's "only other option . . . and [defendant] alluded to this, is to represent [himself]." It described that option as "a very dangerous thing to do," and stated that it would have to conduct a

10

Crisafi[4] hearing to ensure defendant "understood all the pitfalls in representing [himself]."

Defendant's counsel interjected and stated he did not believe defendant "would be his best advocate" and should not represent himself.  The court concurred and commented "a person who represents himself has a fool for a client."  The trial court further stated that proceeding pro se "would be the only other option for you.  It[ is] either [defendant's then-trial counsel] or you represent yourself."

Defendant continued to assert his right to represent himself.  He stated that counsel was "not trying to help [him]" and was "not doing a good job communicating with [him]."  He also stated, "I want to speak[,] and he don't even – like – like, I want to defend myself.  I feel like I cannot defend myself with him as my attorney."  The court then engaged in the following colloquy with defendant:

> THE COURT:     Do you want to represent yourself?
>
> DEFENDANT:   I – I would rather a different attorney, because I don't – like, I don't –
>
> THE COURT:     You know what?  That's – that –

---

[4]  State v. Crisafi, 128 N.J. 499 (1992).

> DEFENDANT: That's – he's not – they're not – he's not giving me a fair shot to – to – to defend my life.
>
> THE COURT: You can ask Mr. Johnson from the Public Defender's Office, but I don't think that's going to happen. I think your – your two choices would be the lawyer you have[] or representing yourself. And that's a real dicey proposition.

The issue of defendant's representation does not appear to have been raised again on the record and a hearing was never conducted to determine the propriety of defendant representing himself or if there was good cause to replace his assigned counsel.

At trial, Gray failed to appear and did not give a statement to the police. Defendant's counsel argued defendant acted reasonably in defending his girlfriend's cousin when he punched Gray, and that defendant possessed the gun for a lawful purpose, "to protect himself from . . . Gray."

During trial, defendant requested an adverse inference charge on missing mobile video recorder (MVR) footage from the police patrol vehicles that arrived at the scene. The court noted a written request for the video was timely made, but that the State failed to respond to the request or produce the video. Defendant contended this discovery violation was significant as the video could have been evidential to his defense, thus requiring an adverse inference charge.

12

The court denied defendant's request. It first explained that Sergeant Millroy testified that his MVR was not running during the incident and that he was unsure whether Officer Santiago's vehicle was equipped with an MVR. As a result, the court found that it was "clearly apparent that [the video] wouldn't show anything," because by the time Officer Santiago arrived the incident was over. The court also declined to sanction the State for the discovery violation despite its expression of displeasure with the State's disregard of defendant's discovery request because "there[was] no harm, no foul" to defendant. The court did, however, permit defendant to "speak to the jury about the lack of evidence."

Defendant renewed his request for an adverse inference charge after testifying, during which he newly claimed to have hidden his gun within the rim of the SUV's rear passenger wheel. Specifically, he contended that the video would have corroborated his testimony on "where the gun was recovered." The court questioned the relevance of that point, and defendant asserted the video of the recovered gun's location would bolster defendant's testimony and impeach Sergeant Millroy's testimony.

The State also explained that there was no evidence that the MVR "actually existed." The court again rejected the application finding that any MVR video that may have existed was still irrelevant to any disputed issue.

The court instructed the jury on the lesser included offense of simple assault and that there were "two separate species of simple assault [alleged by the State]. One is 2C:12-1(a)(1), the other is -1(a)(3) . . . . Attempting to cause bodily injury to [the victim], and/or, attempting by a physical menace, to put [the victim] in fear of imminent, serious bodily injury." The court instructed the jury that "[a]ll [twelve] deliberating jurors do not have to agree on which type of simple assault is . . . proven beyond a reasonable doubt, provided all [twelve] of the deliberating jurors must agree that one or the other type of simple assault has been proven beyond a reasonable doubt."

Explaining the elements of possession of a weapon for an unlawful purpose, the court charged:

> Now, the fourth element the State must prove beyond a reasonable doubt is that the defendant had a purpose to use the firearm in a manner that was prohibited by law. . . . Now, in this case, the State contends that the defendant's unlawful purpose in possessing that firearm was to terrorize and/or threaten, and/or menace, and/or assault [the victim]. . . . The unlawful purpose alleged by the State may be inferred from all that was said or done, and from all the surrounding circumstances of the case. However, the State need not prove the defendant accomplished his unlawful purpose in using the firearm.

During deliberations, the jury asked two questions. First, "Clarification of simple assault, is the menacing with the gun included in the gun charge,

possession of a weapon for unlawful purposes?"  Second, "Does the simple assault charge apply only to the physical assault in the [building], or does it apply to the menacing with the gun?"

After discussing responses with defendant's counsel and the State, the court answered the first question without objection by explaining "it could be, as could . . . terrorize, threaten, and/or assault."  In answering the second question, the court clarified, again, without objection,  they were "considering two separate and independent theories that constitute simple assault" and repeated his previous charge that defendant could be found guilty as long as all twelve jurors agreed "one or the other type of simple assault has been proven beyond a reasonable doubt."

The jury found defendant not guilty of aggravated assault, but guilty of the lesser included offense of simple assault, as well as unlawful possession of a handgun, and possession of that weapon for an unlawful purpose.  As noted, the court merged the simple assault charge into the possession of a weapon for an unlawful purpose offense.  After the court denied defendant's request for a Graves Act waiver, it applied and weighed the applicable aggravating and mitigating factors and sentenced defendant to concurrent eight-year custodial terms for unlawful possession of a handgun and for possession of a weapon for

15

an unlawful purpose with four years of parole ineligibility. This appeal followed.

## II.

In defendant's first point, he contends the court incorrectly denied his request to suppress the gun that he was convicted of unlawfully possessing. In doing so, he does not question Sergeant Millroy's actions after he heard what he believed to be a gun hit the ground. Instead, he limits he challenge to moments before the sergeant exited his vehicle, contending Sergeant Millroy conducted an unconstitutional investigatory stop at the moment he "shine[d] a spotlight" on defendant while approaching in a marked police vehicle on the side of the road closest to defendant. In support, defendant primarily relies on State v. Rosario, 229 N.J. 263 (2017), for the proposition that a person would not feel free to leave when "police illuminate [that] person with a targeted light while approaching them" from "the wrong lane." We disagree with defendant's argument.

In reviewing the grant or denial of a motion to suppress, we "must defer" to the motion judge's factual findings "so long as those findings are supported by sufficient evidence in the record." State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). We ordinarily defer to

16

those findings because they "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Lamb, 218 N.J. 300, 313 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)).

We disregard those findings only when they are "so clearly mistaken that the interests of justice demand intervention and correction." State v. Hagans, 233 N.J. 30, 37-38 (2018) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). We review a motion judge's legal conclusions de novo. Dunbar, 229 N.J. at 538.

Both the federal and state constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7; see also State v. Terry, 232 N.J. 218, 231 (2018). "The test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts." Terry, 232 N.J. at 231 (quoting South Dakota v. Opperman, 428 U.S. 364, 372-73 (1976)).

There are three types of interactions with law enforcement, each involving different constitutional implications depending on the event's impact on an individual's freedom to leave the scene. First, a "field inquiry is essentially a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer." Rosario, 229

17

N.J. at 271. The individual is free to leave; therefore, field inquiries do not require a well-grounded suspicion of criminal activity before commencement. Id. at 271-72; see also Elders, 192 N.J. at 246.

Second, an investigatory stop or detention, sometimes referred to as a Terry[5] stop, involves a temporary seizure that restricts a person's movement. A Terry stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Elders, 192 N.J. at 247 (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). Third, an arrest requires "probable cause and generally [are] supported by an arrest warrant or by demonstration of grounds that would have justified one." Rosario, 229 N.J. at 272.

When "determining whether a seizure occurred, a judge must consider whether 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.'" State v. Stovall, 170 N.J. 346, 355 (2002) (alteration in original) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). To establish that a stop was valid, the State has the burden of proving that the police were aware of "specific

---

[5] Terry v. Ohio, 392 U.S. 1, 20 (1968).

and articulable facts which, taken together with rational inferences from those facts, [gave] rise to a reasonable suspicion of criminal activity." State v. Mann, 203 N.J. 328, 338 (2010) (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)); see Terry, 392 U.S. at 20. If there was no reasonable suspicion, evidence discovered during a search conducted during the detention is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

Here, the court did not err in denying defendant's motion to suppress. Until Sergeant Millroy ordered defendant on the ground, as the court correctly found, he was merely engaging in a field inquiry and did not require "a well-grounded suspicion of criminal activity before commencement." Rosario, 229 N.J. at 271-72. After learning of a potential dispute from a cab driver in the area and seeing two motorcycles speed away, Sergeant Millroy stated that he approached the scene using his marked vehicle's alley light. When he observed defendant carrying a helmet and walking towards his motorcycle he simply exited his vehicle. Sergeant Millroy did not "make demands or issue orders," and did not ask any questions that were "overbearing or harassing in nature." State v. Davis, 104 N.J. 490, 497 n.6 (1986). In fact, he did not say a word to defendant. Nor did he, at that point, accuse defendant of any wrongdoing. See State v. Nishina, 175 N.J. 502, 510 (2003).

We therefore find defendant's reliance on <u>Rosario</u> misplaced. There, a police officer who received an anonymous tip that the defendant was selling drugs and recognized defendant's car while on patrol. <u>Rosario</u>, 229 N.J. at 267. The officer positioned his car at a perpendicular angle approximately seven to ten feet in front of the defendant's car, partially confining the defendant's vehicle to an enclosed area. <u>Id.</u> at 268. He then activated the rooftop flood light on his patrol car, aimed it at the defendant's car, and, after noticing that she was still in the car, approached her and asked her to produce identification. <u>Ibid.</u> Under those circumstances, the Supreme Court concluded the encounter was an investigative detention because someone:

> [S]itting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car that shines a flood light into the vehicle, only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave.
>
> [<u>Id.</u> at 273.]

Unlike in <u>Rosario</u>, defendant's freedom of movement was never confined by Sergeant Millroy such as by positioning the marked patrol vehicle to prevent defendant's departure on his motorcycle. Instead, the sergeant was investigating a disturbance and approached 76 Market Street because that is the vicinity where he observed two speeding, departing motorcycles. He employed his alley light,

which notably was activated <u>before</u> he approached 76 Market Street, and observed defendant walking with a motorcycle helmet in his left hand and with his right hand firmly against his body. Even then, Sergeant Millroy did not prevent defendant from leaving the area, nor was it reasonable to conclude that defendant's movements were restrained; indeed, defendant himself continued walking toward his motorcycle when he saw the sergeant. Based on all the circumstances, we are satisfied that Sergeant Millroy's use of the alley light while driving in the opposite lane of traffic did not turn his field investigation into a <u>Terry</u> stop.

III.

Defendant, in his pro se brief, contends the court erred in denying his request for an adverse inference jury charge on missing video. He asserts Sergeant Millroy's testimony was false, and that the missing MVR video was a "critical piece of evidence," without which he could not "challenge the testimony and credibility of the responding officers." We are not persuaded by this argument.

Trial courts have broad discretion in determining the appropriate sanctions for discovery-rule violations. <u>State v. Marshall</u>, 123 N.J. 1, 134 (1991) (citing <u>State v. Toro</u>, 229 N.J. Super. 215, 223 (App. Div. 1988)). "An adverse-

21

inference charge is one permissible remedy for a discovery violation . . . ." State v. Dabas, 215 N.J. 114, 140 (2013).

In State v. Richardson, 452 N.J. Super. 124, 134 (App. Div. 2017), we addressed the pre-indictment destruction of "unquestionably relevant" evidence by the State, and held "the State may not destroy law enforcement's videorecording of an offense" by failing to preserve and produce the recording where "the recording enables a defendant to test the officer's version of what transpired." Id. at 134, 141. We concluded that such destruction "violate[s] [the State's] implied obligations under the criminal discovery rules and our caselaw," and may warrant "an adverse inference instruction." Id. at 132. Although we concluded in Richardson that "defense counsel's timely request to preserve the evidence" made a particularly "strong" case "for such an adverse inference charge," we recognized "that trial courts are vested with the discretion to fashion an appropriate sanction for a violation of discovery obligations" in order "to 'balance the scales' that the State tilted by permitting the recording's destruction." Id. at 137-38.

Here, we are satisfied that the court did not abuse its discretion in denying defendant's request for an adverse inference on the missing video. Defendant only contends that the video would have revealed Sergeant Millroy's testimony

was false by establishing that he recovered defendant's gun from a different location. We reject that argument for two reasons. First, as noted by the court and the State, defendant failed to establish that any MVR video ever existed. Instead, Sergeant Millroy testified that his vehicle's MVR was not running at the time of the incident, and he was unaware if Officer Santiago's car was equipped with an MVR.

Second, and significantly, even if video was recorded and depicted the recovery of defendant's gun, the specific location from which the gun was recovered was not critical to the offense under which defendant was charged. In either scenario, defendant's gun would still be recovered after defendant discarded it. As such the court did not abuse its discretion in declining to provide an adverse interest charge, particularly in light of the court's related ruling permitting defendant's counsel to argue the consequence of the missing video as it effected the State's proofs, because the location where the weapon was found was not "unquestionably relevant" evidence. Richardson, 452 N.J. Super. at 141; see also Marshall, 123 N.J. at 134.

IV.

In Point II.B, defendant argues the court committed structural error by failing to properly address his requests to proceed pro se. Relying on State v.

Rose, 458 N.J. Super. 610 (App. Div. 2019), defendant argues that his convictions and sentence should be vacated because the court failed to conduct a hearing or substantively consider his request contrary to Faretta v. California, 422 U.S. 806 (1975). We agree.

"[A] defendant has a constitutionally protected right to represent himself in a criminal trial." Id. at 816; see also State v. Outland, 245 N.J. 494, 505 (2021). Nonetheless, because a waiver of the right to counsel constitutes a relinquishment of "many of the traditional benefits associated with" that right, it must be made "knowingly and intelligently." Faretta, 422 U.S. at 835; see also Outland, 245 N.J. at 505-06. We "review a trial court's denial of a defendant's motion to represent himself for abuse of discretion." Id. at 507.

To assert the right of self-representation, "[a] two-step process has emerged." Rose, 458 N.J. Super. at 626. First, in order for the right to attach, defendant must assert it "clearly and unequivocally." State v. Harris, 384 N.J. Super. 29, 57 (App. Div. 2006) (quoting Faretta, 422 U.S. at 835). In doing so, "defendant need only make the request 'unambiguously . . . so that no reasonable person can say that the request was not made.'" Rose, 458 N.J. Super. at 627 (quoting Dorman v. Wainwright, 798 F.2d 1358, 1366 (11th Cir. 1986)).

Defendant's request must also be made "'in a timely fashion' so as not to 'disrupt the criminal calendar, or a trial in progress.'" Id. at 626 (quoting State v. Buhl, 269 N.J. Super. 344, 362 (App. Div. 1994)). However, "the timing of the request is only one factor that a court must consider in ruling on a motion to proceed pro se." State v. Thomas, 362 N.J. Super. 229, 241 (App. Div. 2003); see also Gov't of Virgin Islands v. James, 934 F.2d 468, 469-70 (3d Cir. 1991) (finding valid defendant's request to proceed pro se asserted on the day of trial).

Second, the trial court must conduct a hearing to ascertain "whether the waiver is indeed knowing, voluntary, and intelligent after a searching inquiry that involves advising the defendant of the risks and pitfalls of self-representation." Rose, 458 N.J. Super. at 627; see also Outland, 245 N.J. at 506 (describing the inquiry); State v. Reddish, 181 N.J. 553, 593-95 (same); Crisafi, 128 N.J. at 510-12 (same). "Following the hearing, the court generally must permit the defendant to proceed pro se if it finds on the record that the defendant has knowingly, voluntarily, and intelligently waived the right to counsel and decided instead to proceed pro se." Rose, 458 N.J. Super. at 627. A "court's failure to address defendant's request [to proceed pro se] is a structural error that entitles defendant to a new trial." Id. at 638; see also Outland, 245 N.J. at 507

A-0874-19

("When a defendant's right of self-representation is violated, reversal of the defendant's conviction is warranted.").

In State v. Figueroa, the trial court denied defendant's motion to represent himself after holding a hearing to determine if he was waiving his right to counsel knowingly and voluntarily. 186 N.J. 589, 592, 596 (2006). The manner in which the court questioned defendant, however, resulted in him "constantly modif[ying] the scope of his request . . . and . . . vacillat[ing] between a request for self-representation and a request for hybrid representation." Id. at 595-96. While noting that "there is no constitutional right to partial or hybrid representation," our Supreme Court held that because the record did not disclose the "true nature of defendant's request" it was "compelled to conclude that a Faretta/Crisafi/Reddish violation [was] present". Id. at 594, 596.

In Rose the defendant requested to proceed pro se after the court denied his request for substitution of his assigned counsel. 458 N.J. Super. at 621-22. The court did not hold a hearing or respond to defendant's request. Id. at 623. Defendant proceeded to trial with his appointed counsel and was convicted. Ibid. On defendant's appeal from a denial of post-conviction relief, we remanded for an evidentiary hearing to determine whether defendant waived his right to self-representation and concluded that if defendant did not waive that

26

right "the court's failure to address defendant's request is a structural error that entitles defendant to a new trial." Id. at 638.

Here, defendant asserted that he wished to proceed pro se by stating that he "want[ed] to defend [himself]" and "fe[lt] better off going to trial by [himself] than going with [counsel]." Indeed, the court acknowledged that request by noting that defendant "alluded to" wanting to represent himself and explaining that it would have to conduct a Crisafi hearing. Because defendant clearly requested to proceed pro se, the court was obligated to conduct a hearing to ensure his waiver of his right to counsel was "knowing, voluntary, and intelligent." Rose, 458 N.J. Super. at 627. Its failure to do so constitutes structural error and compels us to vacate defendant's conviction and order a new trial. Id. at 638.

Contrary to the State's argument, the timing of defendant's request did not relieve the court of its obligation to hold a hearing. First, we note that the court characterized defendant's request as but "a little late," and did not deny the application on that basis, nor would it have been appropriate to do so without making further inquiry as defendant did not seek an adjournment, nor did the court conclude one would have been necessary. Further, while jury selection had commenced, a jury was not yet impaneled. In any event, the timing of

defendant's request, while certainly relevant, is not dispositive as timeliness is "only one factor that a court must consider in ruling on a motion to proceed pro se." Thomas, 362 N.J. Super. at 241; see also Gov't of Virgin Islands v. James, 934 F.2d at 469-70; United States v. Peppers, 302 F. 3d 120, 133 (3d Cir. 2002); Buhl v. Cooksey, 233 F.3d 783, 794-95 (3d Cir. 2000).

Further, we are satisfied that the court was not relieved of its obligation to make further inquiries regarding defendant's desire to proceed pro se simply because he also stated he would like a different assigned counsel. In Rose, 458 N.J. Super. at 628-29, defendant also requested replacement counsel before filing an application to represent himself. See also Figueroa, 186 N.J. at 595-596 (court vacated defendant's convictions findings a "Faretta/Crisafi/Reddish violation" when it was unclear if defendant sought to engage in hybrid representation or represent himself).

In sum, our decision to vacate defendant's convictions and remand for a new trial is based substantially on the fact that the court failed to conduct any substantive inquiry as required by Outland, Faretta, Crisafi, and Reddish, and that failure was of constitutional import in light of defendant's request to appear pro se. On remand, "[b]ecause the violation . . . is of constitutional dimension, defendant . . . [shall be] entitled to exercise his constitutional rights anew."

Figueroa, 186 N.J. at 596. If he still wishes to represent himself, "[the defendant] must once again affirmatively request to proceed pro se," at which point "the court must conduct an appropriate inquiry." Ibid. (alteration in original) (quoting Buhl, 233 F.3d at 807 n.25).

In light of our decision, we need not reach defendant's argument in Point II.C that the court also erred in failing to make appropriate inquiry consistent with Martel v. Clair, 565 U.S. 648, 664 (2012) regarding his request for replacement counsel, other than to state that in the event defendant decides to renew his request, as opposed to seeking to proceed pro se, the court should address the bases for that request in a substantive manner and determine if sufficient cause exists for replacement counsel to be assigned. See Crisafi, 128 N.J. at 518 ("If a defendant has good cause for substituting counsel, the trial court should entertain a request."); State v. Coon, 314 N.J. Super. 426, 438 (App. Div. 1998) ("[A] court may not require the Public Defender to assign new counsel to a defendant who was dissatisfied with the attorney assigned to represent him, absent a showing of 'substantial cause.'" (quoting State v. Lowery, 49 N.J. 476, 489 (1967))); United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972) (If a court refuses to inquire into a seemingly substantial complaint about counsel . . . or if on discovering justifiable dissatisfaction a

A-0874-19

court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right.)

To the extent we have not addressed any specific contentions in the previous sections, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). As noted, in light of our decision, we do not reach the additional arguments raised by defendant in Points II.C, III, and IV.

Reversed and remanded for a new trial consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION